608 A.2d 162

**John BOOTH a/k/a Marvin Booth**

v.

**STATE of Maryland.**

**No. 20, Sept. Term, 1991.**

Court of Appeals of Maryland.

June 24, 1992.

Julia Doyle Bernhardt, Asst. Public Defender and John L. Kopolow, Asst. Public Defender (Stephen E. Harris, Public Defender, all on brief), Baltimore, for appellant.

Gwynn X. Kinsey, Jr., Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Cathleen C. Brockmeyer, Asst. Atty. Gen., all on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

RODOWSKY, Judge.

Appellant, John Booth (Booth), having previously been found guilty of murdering Irvin and Rose Bronstein in 1983, now appeals from the death sentence which a jury in the Circuit Court for Baltimore City for the third time has imposed on him as the direct perpetrator of the murder of Irvin Bronstein.[1] The evidence underlying the findings of guilt is reviewed in *Booth v. State*, 306 Md. 172, 507 A.2d 1098 (1986). Here Booth raises fourteen issues directed at

---

1. The instant matter is the fourth appeal to this Court in the prosecution of Booth for the Bronstein murders. In *Booth v. State*, 301 Md. 1, 481 A.2d 505 (1984) (*Booth I*), we affirmed the denial of Booth's motion, following a mistrial, to dismiss the indictments on double jeopardy grounds. *Booth v. State*, 306 Md. 172, 507 A.2d 1098 (1986) (*Booth II*) affirmed both the finding of guilt and the imposition of the death penalty by a jury presided over by Judge Edward J. Angeletti in the fall of 1984. That death sentence was vacated by the Supreme Court in *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), because victim impact evidence was admitted at sentencing. At a new sentencing proceeding in 1988, Booth was again sentenced to death. This Court vacated the sentence for error in excluding evidence offered by Booth. *Booth v. State*, 316 Md. 363, 558 A.2d 1205 (1989) (*Booth III*). The instant appeal arises from the resentencing conducted following that mandate. *See also Booth v. State*, 306 Md. 313, 508 A.2d 976 (1986) (different murder), *aff'g* 62 Md.App. 26, 488 A.2d 195 (1985).

his most recent death sentence. We shall state additional facts as necessary when we consider Booth's separate contentions.

## I

### Modified *Allen* Charge

Booth submits that the trial court erred by giving a modified *Allen* charge after the jury reported an inability to agree on his first-degree principalship. This result obtains under special rules relating to capital sentencing which, Booth argues, render a nonverdict a verdict.

The facts are these. From the time the venire assembled until submission of the case to the jury, this proceeding consumed eleven days, on seven of which testimony and arguments were presented. In its charge to the jury at the conclusion of all of the evidence, the court gave a modified *Allen* instruction in the form requested by the defense. Defense counsel devoted approximately half of his summation to arguing that Booth was not a principal in the first degree to the Irvin Bronstein murder.

The jury began deliberations at 3:00 p.m. and was dismissed for the first calendar day of deliberations at 7:15 p.m. The next morning the court, with counsel, considered four requests from the jury. In response the court advised the jurors that they could not have a dictionary and that they would have to rely on their best recollections of the testimony of a principal state's witness, Jewell ("Judy") Edwards Booth. The court also repeated its instructions on reasonable doubt and preponderance of the evidence.[2] At 9:17 a.m. the jurors resumed deliberations. Lunch orders were taken. At 2:25 p.m. on the second calendar day of deliberations the court received this message from the jury:

---

**2.** The jury's request for a further explanation of preponderance of the evidence led Booth's trial counsel to infer that the jury was considering mitigating factors.

"Statement: We are split on Question 1, Section 1. We are unable to come to an agreement on that statement."

This note referred to the following issue on the sentencing form furnished to the jury pursuant to Maryland Rule 4–343(e):

"Based upon the evidence, we unanimously find that each of the following statements marked 'proven' has been proven BEYOND A REASONABLE DOUBT and that each of those statements marked 'not proven' has not been proven BEYOND A REASONABLE DOUBT.

"1. The defendant was a principal in the first degree to the murder.

proven not proven"

That provision of the Maryland Rules is an implementation of the definition of the terms "defendant" and "person" under the Maryland death penalty statutes wherein the quoted terms "include only a principal in the first degree," except in contract murders. Md.Code (1957, 1992 Repl.Vol.), Art. 27, § 413(e)(1).[3]

Booth's counsel, upon learning of the jury's message, moved that the court dismiss the jury and impose a sentence of life imprisonment. The motion was predicated on a statutory provision which, at the time of the murders, read:

"If the jury, within a reasonable time, is not able to agree as to sentence, the court shall dismiss the jury and impose a sentence of imprisonment for life."

Md.Code (1957, 1982 Repl.Vol.), Art. 27, § 413(k)(2).

The court overruled Booth's motion and instructed the jury as follows:

"I am going to reread to you the charge on the law so that you are clear as to what your responsibilities are in that area.

**3.** Unless otherwise indicated all statutory references are to Md.Code (1957, 1992 Repl.Vol.), Art. 27.

"The law requires that in order for you to conclude beyond a reasonable doubt that the State has proven that Mr. Booth was a first degree principal in the murder of Mr. Bronstein, all of you must agree within a reasonable time, and your verdict must be unanimous.

"If any of you cannot conclude that the State has proven beyond a reasonable doubt that Mr. Booth is a principal in the murder of Mr. Bronstein, then you must mark 'not proven' in the form and enter the words 'life imprisonment' in Section 6.

"In arriving at your decision, you must consult with one another and deliberate with a view to reaching an agreement, if you can do so without violence to your individual judgment.

"Each of you must decide the case for yourself, but you must do so only after an impartial consideration of the evidence with your fellow jurors. During your deliberations, do not hesitate to re-examine your own views. You should change your opinion if convinced you are wrong, but do not surrender your honest belief as to the weight or effect of the evidence only because of opinions of your fellow jurors, or for the mere purpose of reaching a verdict.

"Do you understand that instruction?

"THE JURY: Yes.

"THE COURT: Very well. Then I will ask you to go back to the jury room and continue your deliberations, please."

At 5:50 p.m. on the second calendar day of deliberations the jury sent a message to the judge advising that two of its members were not feeling well. The jury asked to be excused for the evening, to return the next morning to continue deliberations. The defense motion, renewed at that time, was denied.

On the third calendar day of deliberations the jury assembled at 9:00 a.m. and returned with its verdict at 2:25 p.m. Unanimously, and beyond a reasonable doubt, the jury found Booth was a principal in the first degree to the

murder. Unanimously, and by a preponderance of the evidence, the jury found that the seven statutorily recognized mitigating factors did not exist and that there were no other mitigating factors. Thus, having unanimously found the aggravating factor of robbery, the sentence was death.

The result of a hung jury in a capital sentencing proceeding differs from that in other cases. Under former § 413(k)(2) a hung jury in the instant matter would result in the court's dismissing the jury and imposing a life sentence. In other types of criminal and civil cases, the result of a hung jury is a mistrial. Booth's argument has as its premise that, because of that difference, a jury in a capital sentencing proceeding may return as a verdict a statement that it is unable to agree. A corollary to that premise is that the jury's statement that it cannot agree is conclusive in determining when that point has been reached. Applying these concepts to the facts here, Booth views the jury's message to the court as a verdict of inability to agree, thereby requiring a life sentence. In any event, Booth submits that a modified *Allen* charge cannot be given because the permissible verdict of inability to agree is one which the jury must be allowed to reach without any attempt by the court to produce unanimity.

### A

■ Although the capital sentencing procedures of some states function in the fashion advocated by Booth, Booth's position is contrary to Maryland procedure on the principalship issue. We considered former § 413(k)(2) in *Calhoun v. State*, 297 Md. 563, 468 A.2d 45 (1983), *cert. denied*, 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984), where Calhoun argued that it was error for the trial judge to refuse to instruct the jury that a life sentence would be imposed if the jury could not agree within a reasonable time. *Id.* at 593, 468 A.2d at 59. Rejecting that contention, we said:

> "Giving the instruction to the jury before deliberation could prompt someone to hold out for just a bit more than

a reasonable time to insure that the death penalty was not imposed. It likewise could cause a jury to rush through its deliberations to avoid being called back by the court and told that because a reasonable time had passed without a verdict the sentence would be life imprisonment. The statute is a mandate directed to the court, not the jury. As the jury here reached its decision within a reasonable time, no instruction was required."

*Id.* at 595, 468 A.2d at 60. Thus, in Maryland, it is the court's function to determine whether the jury's total deliberations have extended beyond a reasonable time. Consequently, after having made that determination, it is the court which "shall dismiss the jury and impose a sentence of imprisonment for life." § 413(k)(7)(iii) and former § 413(k)(2). The Maryland trial judge presiding over a capital sentencing proceeding before a jury basically retains the traditional role of determining whether the jury is hung.

The complexities created by a unanimity requirement for all of the questions which a jury might be required to answer in a capital sentencing proceeding were fully exposed in the majority and dissenting opinions in *Mills v. State*, 310 Md. 33, 527 A.2d 3 (1987), *sentence vacated*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). This Court filed its opinion in *Mills* on June 25, 1987. On July 27, 1987, this Court, as an emergency measure, adopted amendments to Maryland Rule 4–343. 14 Md.Reg. 1854. Rule 4–343 is, in addition to being an exercise of this Court's constitutional rule-making authority, Md. Const. art. IV, § 18, a response to the legislative invitation in § 413(1) which reads:

"The Court of Appeals may adopt rules of procedure to govern the conduct of a sentencing proceeding conducted pursuant to this section, including any forms to be used by the court or jury in making its written findings and determinations of sentence."

Section I of the capital sentencing verdict form, as adopted in 1987 and in effect at the time of the subject sentencing, resolves the earlier debate over whether principalship in the first degree is decided at the guilt or sentenc-

ing stage. Section I of the form also explicitly requires jury unanimity for a finding that first degree principalship either has or has not been proven beyond a reasonable doubt. There is no middle ground. There is no verdict under § I of the Rule 4–343 form whereby some jurors conclude "proven" and some conclude "not proven."

The reason for requiring unanimity as to whether first degree principalship either has or has not been proven is found in the rule-mandated directions at the conclusion of § I of the form. If the issue on principalship is "marked 'not proven,' [the jury is to] proceed to Section VI and enter 'Life Imprisonment.'" That is a verdict. But the jury may not automatically terminate the sentencing by declaring that it is unable to agree on principalship.

Comparing § IV of the capital sentencing verdict form to § I highlights the conclusion stated above. Section IV deals with mitigating factors. As to each statutorily recognized mitigating factor, and as to any additional mitigating factors, the jury is to indicate one of three possible findings:

"☐ (a) We unanimously find by a preponderance of the evidence that the above circumstance exists.

☐ (b) We unanimously find by a preponderance of the evidence that the above circumstance does not exist.

☐ (c) After a reasonable period of deliberation, one or more of us, but fewer than all 12, find by a preponderance of the evidence that the above circumstance exists."

No other section of the sentencing form for capital cases is structured similarly to the mitigating circumstances section. Section IV permits the jury in effect to conclude that "a reasonable period of deliberation" has expired as to a mitigating circumstance, to check option (c) as to that circumstance, and to move on. In § I, on the other hand, the jury has only two options. It must be unanimous in its conclusion as to either, and, if the jury cannot achieve unanimity, the court, rather than the jury, decides whether a reason-

able period of time has expired, so that a sentence of death may not be imposed.

Booth's argument—that inability to agree is a verdict—is inspired by *Rush v. State,* 491 A.2d 439 (Del.1985) and by *State v. Hunt,* 115 N.J. 330, 558 A.2d 1259 (1989). The special verdict form in *Rush* asked two questions, whether the jury unanimously found an aggravating circumstance and, if so, whether the jury unanimously recommended death. A "yes" or "no" answer was to be supplied to each question.[4] *Id.* at 449 n. 12. After approximately two hours of deliberation, the jurors, who had already signed the form, advised the court that they could not reach a unanimous decision on the second question, and asked for an instruction how to fill in the special verdict form. It was in that context that the Delaware court stated:

> "In view of the unequivocal announcement that the jury was unable to reach unanimous agreement as to the death sentence, we hold that, under all of the circumstances, such announcement constituted, by necessary implication, a verdict having the same force and effect as a written 'No' answer to Interrogatory No. 2."

*Id.* at 454.

In *Hunt,* a trial judge received a note from a jury saying that "[w]e cannot find a unanimous decision on the mitigating factor [sic] outweighing the aggravating factor." 558 A.2d at 1283. The Supreme Court of New Jersey held that, rather than immediately send the jury back for further deliberations, the trial judge should have asked "whether the note stated [the jury's] verdict or whether the jury wanted more time to deliberate." *Id.; compare State v.*

---

**4.** In this respect *Rush* deals with a question phrased like that in § V of the Maryland form, reading:

> "We unanimously find that the State has proven by A PREPONDERANCE OF THE EVIDENCE that the aggravating circumstances marked 'proven' in Section III outweigh the mitigating circumstances in Section IV.

_____ _____

yes no"

*Ramseur,* 106 N.J. 123, 524 A.2d 188, 279–80 (1987). For reasons which involve some major leaps in logic from a "concern" to a "likelihood," the court announced the following result:

> "If the trial court had asked the right question, it might have learned the jury had reached a final verdict resulting in imprisonment rather than death. We are concerned that absent the trial court's error, there was 'not merely a theoretical possibility but a substantial likelihood,' that a non-unanimous verdict would have been returned. Confronted with that likelihood, we cannot require defendant to run the risk that a different jury might decide he should die. On remand, defendant may not again be subjected to the death penalty."

558 A.2d at 1285 (citation omitted).

*Rush* was argued to the Supreme Court of Georgia in *Romine v. State,* 256 Ga. 521, 350 S.E.2d 446 (1986), *cert. denied,* 481 U.S. 1024, 107 S.Ct. 1912, 95 L.Ed.2d 517 (1987). The Supreme Court of Georgia said:

> "[I]t does not follow that, because the consequences of a hung jury on the question of sentence differ from the consequences of a hung jury on the question of guilt, the decision of whether the jury is truly deadlocked must be taken from the sound discretion of the trial judge and given to the jury.
>
> "In contrast to the policy codified in Delaware law, under Georgia law a jury is expected to review the evidence and to endeavor to reach unanimity 'one way or the other' on the question of sentence, and, if possible, to affirmatively and unanimously recommend either death or mercy."

350 S.E.2d at 450.

■ In the instant matter, whether the jury was hung on the issue in § I of the form, and whether a mistrial should have been declared and a life sentence imposed, were, like Georgia law on the sentence, questions for the trial court to decide in its discretion. *See also Fretwell v. State,* 289 Ark.

91, 708 S.W.2d 630, 633 (1986); *Commonwealth v. Chester*, 526 Pa. 578, 587 A.2d 1367, 1379–81, *cert. denied*, —— U.S. ——, ——, 112 S.Ct. 152, 422, 116 L.Ed.2d 117, 442 (1991); *Montoya v. State*, 810 S.W.2d 160, 166 (Tex.Crim.App.1989), *cert. denied*, —— U.S. ——, 112 S.Ct. 426, 116 L.Ed.2d 446 (1991).[5]

## B

Closely related to Booth's non-unanimous verdict premise is Booth's argument that the modified *Allen* charge given in this case was coercive. The ultimate paragraph of Judge Angeletti's modified *Allen* charge is substantially the instruction which the United States Supreme Court found not to be coercive in the capital punishment case of *Lowenfield v. Phelps*, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988).

*Lowenfield* was a Louisiana capital murder prosecution, *State v. Lowenfield*, 495 So.2d 1245 (La.1985), *cert. denied*, 476 U.S. 1153, 106 S.Ct. 2259, 90 L.Ed.2d 704 (1986), which came to the court after the denial of federal habeas corpus had been affirmed by the Fifth Circuit, 817 F.2d 285 (1987), over a dissent. The Supreme Court held:

> "Louisiana law provides that if the jury hangs, the court shall impose a sentence of life imprisonment. Petitioner naturally urges that this difference makes the charge here impermissible under the Due Process Clause and the Eighth Amendment. The difference between the division of function between the jury and judge in this case and the division in *Allen* obviously weighs in the constitutional calculus, but we do not find it dispositive. The State has in a capital sentencing proceeding a strong interest in having the jury 'express the conscience of the community on the ultimate question of life or death.' Surely if the

---

5. Under *Calhoun v. State* and current Rule 4–343, it was not correct for the court to instruct that if any juror did not agree that principalship in the first degree had been proven beyond a reasonable doubt, then the jury should check "not proven." Under the form that response would indicate unanimity on the point, when that was not the case. This departure from the rule was not prejudicial to Booth.

jury had returned from its deliberations after only one hour and informed the court that it had failed to achieve unanimity on the first ballot, the court would incontestably have had the authority to insist that they deliberate further. This is true even in capital cases such as this one and *Allen,* even though we are naturally mindful in such cases that the 'qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed.' "

484 U.S. at 238–39, 108 S.Ct. at 551, 98 L.Ed.2d at 577–78 (citations omitted).

*Rush,* decided prior to *Lowenfield,* had held that, in a death penalty hearing "in which lack of unanimity *per se* results in a sentence of life imprisonment, [a modified *Allen* ] instruction is fatal as being overly coercive." 491 A.2d at 453. *Rush* was followed on this point in *Ex parte Giles,* 554 So.2d 1089, 1093 (Ala.1987), which was also decided prior to *Lowenfield.*

■ Here, the jury advised that its inability to agree related to the first issue, that of principalship. That is an issue on which Maryland procedure seeks unanimity. The charge which the court gave did not focus on the minority. It was not coercive simply because the proceeding involved potential capital sentencing. *Compare Graham v. State,* 325 Md. 398, 412–13, 601 A.2d 131, 137–38 (1992) (modified *Allen* charge is not *per se* coercive even if the jury reveals the numerical division) and *Mayfield v. State,* 302 Md. 624, 631–32, 490 A.2d 687, 691–92 (1985) (same). Nor, considering the evidence and the seriousness of the matter to Booth and to the community, did the court abuse its discretion in repeating the *Allen* -type instruction.

## II

### Trifurcation

■ Booth moved that his sentencing proceeding, already the second half of a bifurcated proceeding, be further bifurcated so that the jury would initially decide whether

Booth was a first-degree principal before addressing the other sentencing issues. The trial judge denied the motion. Booth claims that the trial judge erred because evidence, such as the pre-sentence investigation report listing numerous prior crimes, prejudiced his hearing on principalship. After Booth filed his brief, however, this Court decided *Wiggins v. State*, 324 Md. 551, 597 A.2d 1359 (1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1765, 118 L.Ed.2d 427 (1992), which held that it was not error for a trial judge to refuse to order a separate hearing on the principalship issue. *Id.* at 578, 597 A.2d at 1372. Indeed, well before *Wiggins* this Court decided that it was permissible to consider the principalship issue together with the aggravation and mitigation issues. *State v. Colvin*, 314 Md. 1, 17 n. 5, 548 A.2d 506, 514 n. 5 (1988). We reaffirm those holdings, both of which relied on Rule 4–343.

Booth also argues that a trial judge has discretion to bifurcate the principalship issue from the other issues in a sentencing proceeding, a question left unanswered by *Wiggins*. 324 Md. at 578, 597 A.2d at 1372. Because the trial judge denied bifurcation on the ground that, under Rule 4–343, "this court is without authority to grant the motion," Booth submits that there was error requiring reversal.

■ The trial judge did not have discretion to bifurcate the sentencing proceeding in order to separate out the principalship issue. Rule 4–343, and the sentencing form it incorporates, are binding. The rule makes clear that principalship and the other sentencing-related issues are resolved in a unitary sentencing proceeding. The rule applies "whenever a sentence of death is sought under ... § 413." Rule 4–343(a). Under Rule 4–343(e) the sentencing form is to be followed, except as provided in section (f). The form plainly contemplates that one jury will complete the form in one proceeding. Policy reasons advanced by Booth for separating the principalship issue from other sentencing issues were considered and rejected in our rule-making capacity when Rule 4–343 was adopted. They were recon-

sidered when the argument of the dissent in *Colvin* was rejected.

Booth suggests that refusal further to bifurcate would violate the eighth amendment because principalship is an issue of guilt, rather than an issue of penalty, and *Gregg v. Georgia*, 428 U.S. 153, 190–91, 96 S.Ct. 2909, 2933–34, 49 L.Ed.2d 859 (1976), suggested that issues of guilt should be decided separately in a bifurcated proceeding. But Booth had been found guilty of murder in the first degree before the sentencing proceeding began.

### III

### Mitigating Evidence

### A

Appellant contends that the trial judge's refusal to list certain nonstatutory mitigating circumstances on the sentencing form constituted reversible error. Specifically, Booth asked to have eleven additional mitigating factors added to the form, including alcohol and chemical dependency, physical and verbal abuse by his parents, and "emotional trouble." Appellant's Brief at 55. Booth acknowledges that the sentencing form includes a catch-all question that allows the jury to consider nonstatutory mitigating factors. He assumes, however, that the jury failed to consider his evidence offered in mitigation—an assumption apparently derived solely from the jury's unanimous finding that there were no mitigating circumstances. From that assumption Booth concludes that the "court's failure to list the nonstatutory factors and to properly instruct the jury simply made it more likely" that the jury would fail to consider "relevant mitigating evidence" and made it more difficult to obtain effective appellate review. Appellant's Reply Brief at 9. Booth asserts that, in this way, an unconstitutional barrier was erected to consideration of mitigating evidence.

We have held that a defendant in these cases does not have a right to have listed on the sentencing form furnished to the jury nonstatutory issues of a potentially mitigating

nature that have been generated by the evidence. *Booth II,* 306 Md. at 220–22, 507 A.2d at 1122–23. Nevertheless, Booth argues that subsequent opinions by the United States Supreme Court under the eighth amendment of the United States Constitution have altered this rule of *Booth II.* He cites *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), *Hitchcock v. Dugger,* 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987), and *Skipper v. South Carolina,* 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986).

We agree with the State, however, that *Boyde v. California,* 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), is more directly on point than the trio of cases cited by Booth, and that *Boyde* effectively precludes the argument asserted by Booth. Boyde argued that the sentencing form then used by California courts did not allow the jury to consider his background and character because the "unadorned version" of the catch-all mitigation instruction read: " 'Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime.' " *Id.* at 374, 110 S.Ct. at 1194.

The constitutional standard for reviewing an allegedly ambiguous jury instruction is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Id.* at 380, 110 S.Ct. at 1198. The Court held that there was no such reasonable likelihood in *Boyde,* in part because, out of all of the evidence admitted, most of it related to the defendant's background and character, and because "[t]he jury was instructed that it *'shall consider all of the evidence* which has been received during any part of the trial of this case.' " *Id.* at 383, 110 S.Ct. at 1199. *See also State v. Bell,* 406 S.E.2d 165, 171 (S.C.1991) (following *Boyde* ), *cert. denied,* —— U.S. ——, 112 S.Ct. 888, 116 L.Ed.2d 791 (1992).

*Boyde* makes clear that there is no constitutional requirement that every potential mitigating circumstance be listed on the sentencing form. It is also clear, on the other

hand, that the jury may not be barred from considering constitutionally relevant evidence, *Mills,* 486 U.S. at 374–75, 108 S.Ct. at 1865; *Eddings v. Oklahoma,* 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1, 8 (1982); *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964–65, 57 L.Ed.2d 973 (1978) (plurality opinion), although the states retain their traditional discretion in determining how that evidence should be considered, *Payne v. Tennessee,* — U.S. —, 111 S.Ct. 2597, 2608, 115 L.Ed.2d 720 (1991); *Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 3055, 111 L.Ed.2d 511 (1990) (plurality opinion); *Saffle v. Parks,* 494 U.S. 484, 490, 110 S.Ct. 1257, 1261, 108 L.Ed.2d 415 (1990). In this case there is no reasonable likelihood that the jury applied the instructions to prevent consideration of constitutionally relevant evidence.

■ Section IV, Question 8(a) of the sentencing form submitted to Booth's jury stated: "We unanimously find by a preponderance of the evidence that the following additional mitigating circumstances exist." Question 8(b) read: "One or more of us, but fewer than all 12, find by a preponderance of the evidence that the following additional mitigating circumstances exist." Section V of the sentencing form provided:

"Each individual juror shall weigh the aggravating circumstances found unanimously to exist against any mitigating circumstances found unanimously to exist, as well as against any mitigating circumstances found by that individual juror to exist.

"We unanimously find that the State has proven by A PREPONDERANCE OF THE EVIDENCE that the aggravating circumstances marked 'proven' in Section III outweigh the mitigating circumstances in Section IV. [Yes or No]"

The trial judge gave unambiguous instructions on how to apply the evidence to resolve these questions. He instructed the jury that "[a]ny factor causing you to feel sympathy or mercy toward Mr. Booth may be considered by you to be

a mitigating circumstance...." [6] The jury is presumed to have followed those instructions and to have considered the evidence.

Through witnesses other than himself Booth presented extensive evidence on his troubled childhood, his problems with alcohol and drugs, and his emotional problems. Several of his witnesses testified principally about nonstatutory, potentially mitigating circumstances. The trial judge's instructions were clear that such evidence could be found to be mitigating. The sentencing form provided for any one or more jurors to find any nonstatutory mitigating factors and to consider them in the weighing process. There was no judicial error simply because Booth could not persuade any juror by a preponderance to find any mitigation.

### B

Booth also argues that his constitutional right to present mitigating evidence was infringed by the trial judge's ruling that Booth would be exposed to "wide open" cross-examination if he chose to testify, even if Booth limited his testimony on direct to potential mitigation. This ruling was in accord with long-established Maryland law. *See Guy v. State,* 90 Md. 29, 32–33, 44 A. 997, 998 (1899). According to Booth, however, the fact that principalship and mitigation were decided in the same proceeding unconstitutionally impeded him from presenting his own mitigating testimony, because to present the latter would have exposed him to cross-examination on the former. There is no merit to this argument.

---

**6.** Other instructions given by the trial judge also directed consideration of mitigating evidence. At one point the judge stated, "Now, what is a mitigating circumstance? In law, it is any fact or factor about the defendant or his crimes which would make the imposition of a life sentence more appropriate than the imposition of the death penalty." At another, "You must review all of the evidence about the crime, about Mr. Booth and his background, to determine if any other mitigating circumstance not previously listed has been proven by a preponderance of the evidence."

As a matter of constitutional law, it is settled that the fifth amendment right against self-incrimination does not protect from cross-examination a criminal defendant who chooses to testify. *See Brown v. United States,* 356 U.S. 148, 154–55, 78 S.Ct. 622, 626–27, 2 L.Ed.2d 589 (1958). No different rule applies in the sentencing phase of a capital case simply because, under *Lockett,* the defendant has a constitutional right to present mitigating evidence. Maryland law pointedly provides an alternative, of which Booth availed himself. "The obvious purpose of Rule 4–343(d) is to afford the death penalty eligible, convicted murderer the opportunity to make an unsworn statement in mitigation of the death penalty without being subject to cross-examination." *Booth II,* 306 Md. at 198, 507 A.2d at 1111. Although allocution "is not testimony in the conventional sense," it may be considered by the sentencing authority. *Id.*

Moreover, the ruling did not bar the presentation of mitigating evidence through Booth. Booth still had a right to testify, subject to cross-examination. He made a tactical decision not to do so, probably after considering his right of allocution and considering that evidence of potential mitigation would be presented through other witnesses.

## IV

### Life Without Parole Option

The next claimed error is that the trial judge improperly refused to submit to the jury, in addition to life imprisonment or death, a third sentencing option of life imprisonment without possibility of parole.

At the time of Irvin Bronstein's murder, there was no such sentence. The General Assembly added the third option to death sentencings by Chapter 237 of the Acts of 1987. Chapter 237 also required the State to give written notice to the defendant thirty days before trial of intent to

seek life without parole.[7] *See* § 412(b)(2). Chapter 237 took effect on July 1, 1987. 1987 Md.Laws ch. 237, § 2. In *Collins v. State,* 318 Md. 269, 568 A.2d 1, *cert. denied,* —— U.S. ——, 110 S.Ct. 3296, 111 L.Ed.2d 805 (1990), we held that "the life without parole sentencing option is only available for offenses occurring after the effective date of the provision, July 1, 1987." *Id.* at 298, 568 A.2d at 15. *Collins* also rejected the argument that the lack of the third option unconstitutionally limited the jury under *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). 318 Md. at 298, 568 A.2d at 15.

At sentencing, Booth argued that *Collins* is distinguishable because "principalship was not really an issue in *Collins.*" Before this Court Booth has nominally revived that argument. He contends that the failure of the State to offer a third sentencing option violated the eighth and fourteenth amendments to the federal constitution under *Beck v. Alabama, supra.* *Beck* held that states could not force a jury to decide between death-eligible murder and acquittal when the evidence warranted an instruction on a lesser included offense. On the other hand, *California v. Ramos,* 463 U.S. 992, 1007–09, 103 S.Ct. 3446, 3456–57, 77 L.Ed.2d 1171 (1983), held that the rule of *Beck* was not applicable in the penalty phase of a capital case. Booth argues that *Ramos* is distinguishable because Booth's sentencing jury decided an issue of guilt—principalship—and therefore this case is closer to *Beck* than *Ramos.* We reject this argument because in Maryland capital cases principalship is not an issue of guilt; it is an issue of sentencing. *See supra* Part II.

Booth concentrates more on a second argument, which he makes before this Court for the first time, claiming that 1989 amendments to § 412 made the life without parole

---

7. Booth waives both the notice requirement and any defenses based on prohibitions against *ex post facto* laws, insofar as both might relate to a life without parole sentence in this case. Because of our resolution of this issue we have no reason to consider the validity and effect of those waivers.

option applicable to his capital offense. Chapter 677 of the Acts of 1989 disallowed imposition of the death penalty on any person who was mentally retarded at the time of the murder. *See* § 412(f)(1).[8] This was the only substantive change to § 412 made by Chapter 677. Section 2 of the legislative bill made "this Act apply retrospectively to individuals who are awaiting trial or sentencing by the courts of this State on July 1, 1989 and prospectively to any individual sentenced on or after July 1, 1989." Booth

---

8. Chapter 677 of the Acts of 1989 amended § 412. Section 1 of the bill made no changes in subsections (a), (b), (c), and (d) of § 412. Set forth below are the remaining provisions of Chapter 677 (capitals indicate new matter added to then existing law in the bill as introduced, underlined capitals indicate new matter added to existing law by amendments to the bill in the course of passage, and brackets indicate matter deleted from then existing law).

"(e)(1) In this section, ['imprisonment'] THE FOLLOWING TERMS HAVE THE MEANINGS INDICATED.

(2) 'IMPRISONMENT for life without the possibility of parole' means imprisonment for the natural life of an inmate under the custody of a correctional institution, including the Patuxent Institution.

(3) 'MENTALLY RETARDED' MEANS THE INDIVIDUAL HAS SIGNIFICANTLY SUBAVERAGE INTELLECTUAL FUNCTIONING AS EVIDENCED BY AN INTELLIGENCE QUOTIENT OF 70 OR BELOW ON AN INDIVIDUALLY ADMINISTERED INTELLIGENCE QUOTIENT TEST AND IMPAIRMENT IN ADAPTIVE BEHAVIOR, AND THE MENTAL RETARDATION IS MANIFESTED BEFORE THE INDIVIDUAL ATTAINS THE AGE OF 22.

(f)(1) If a person found guilty of murder in the first degree was, AT THE TIME THE MURDER WAS COMMITTED, less than 18 years old [at the time the murder was committed] OR IF THE PERSON ESTABLISHES BY A PREPONDERANCE OF THE EVIDENCE THAT THE PERSON WAS, AT THE TIME THE MURDER WAS COMMITTED, MENTALLY RETARDED, the person shall be sentenced to imprisonment for life or imprisonment for life without the possibility of parole and may not be sentenced to death.

(2) The sentence shall be imprisonment for life unless the State notified the person in writing at least 30 days prior to trial that the State intended to seek a sentence of imprisonment for life without the possibility of parole under this section or § 413 of this article.

SECTION 2. AND BE IT FURTHER ENACTED, That the provisions of this Act apply retrospectively to individuals who are awaiting trial or sentencing by the courts of this State on July 1, 1989 and prospectively to any individual sentenced on or after July 1, 1989.

SECTION 3. AND BE IT FURTHER ENACTED, That this Act shall take effect July 1, 1989."

argues that Section 2 has changed the result in *Collins* and made the life without parole provisions of § 412 *and* § 413 apply retrospectively.

Failure to raise this argument below is a basis for rejecting it. *See* Maryland Rule 8–131(a). Using our discretion under Rule 8–131(a), however, we shall address the argument.

■■■ There is no indication in Chapter 677 or its legislative history that the General Assembly intended to make retroactive anything other than the defense of mental retardation. The life without parole option, unlike the mental retardation defense, is governed by § 413 as well as § 412. In particular, it is § 413 that provides for the specific sentencing options. *See* § 413(k). Had the Legislature intended to make the life without parole option retroactive, undoubtedly it would also have made retroactive the relevant subsections of § 413 somewhere in Chapter 677, and not limited its express statement of retrospectivity to "the provisions of this Act." 1989 Md. Laws ch. 677, § 2.

V

*Ex Post Facto* Law

On May 18, 1983, the date of the death-eligible murder, statutory mitigating circumstances included:

"The murder was committed while the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired as a result of mental incapacity, mental disorder, emotional disturbance, *or intoxication.*"

Md.Code (1982 Repl.Vol.), § 413(g)(4) (emphasis added). By an Act signed by the Governor approximately one week after the murder and effective July 1, 1983, the General Assembly changed § 413 to remove intoxication as an enumerated mitigating circumstance. Chapter 296 of the Acts of 1983. Booth argues that the change violates federal and

Maryland constitutional prohibitions against *ex post facto* laws.[9]

At his second, *i.e.*, 1988, sentencing hearing, Booth moved to have diminished capacity as a result of intoxication included as an explicit mitigating circumstance on the sentencing form submitted to the jury. The court denied the motion. At the sentencing proceeding at issue here, Booth's counsel "renew[ed] and adopt[ed] for the Court's *de novo* consideration all motions previously filed on his behalf in connection with his sentencing for the murder of Irvin Bronstein." The trial court ruled on all previous motions by entering, *de novo*, its prior rulings.

Booth's complaint is that the change in Maryland's statute has made more burdensome a murderer's use of intoxication as a mitigating circumstance. Prior to the 1983 enactment the burden was on the murderer to prove by a preponderance of the evidence diminished capacity as a result of intoxication. If the jury found that fact, then the statute determined that that circumstance was mitigating and that it was to be considered in weighing whether the aggravating circumstance outweighed intoxication and any other mitigating circumstances. After the change, the murderer has the burden of proving by a preponderance of the evidence both the fact of diminished capacity due to intoxication and that that fact is a mitigating circumstance. *See Hunt v. State,* 321 Md. 387, 437, 583 A.2d 218, 242 (1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 117, 116 L.Ed.2d 86 (1991); *Foster v. State,* 304 Md. 439, 482, 499 A.2d 1236, 1258 (1985), *cert. denied,* 478 U.S. 1010, 106 S.Ct. 3310, 92 L.Ed.2d 723 (1986). Both before and after the 1983 amendment, the amount of weight to be given to intoxication as a

---

**9.** The provisions are U.S. Const. art. I, § 10, cl. 1 and Maryland Const. Decl. of Rts. art. 17. The Maryland prohibition has been viewed as having the same meaning as the federal. *Anderson v. Department of Health & Mental Hygiene,* 310 Md. 217, 223, 528 A.2d 904, 907 (1987), *cert. denied,* 485 U.S. 913, 108 S.Ct. 1088, 99 L.Ed.2d 247 (1988).

mitigating circumstance turned on the judgment of each individual juror.[10]

The prohibition against *ex post facto* laws is defined by three historic categories. *Collins v. Youngblood,* 497 U.S. 37, 110 S.Ct. 2715, 2721, 111 L.Ed.2d 30 (1990).

> "[A]ny statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as *ex post facto.*"

*Id.* at ——, 110 S.Ct. at 2719 (quoting *Beazell v. Ohio,* 269 U.S. 167, 169–70, 46 S.Ct. 68, 68, 70 L.Ed. 216 (1925)). The change to § 413 did not deprive Booth of any defense to the crime of murder that was available at the time of the murder. The change, which involves only procedures at the sentencing phase of trial, does not fit in either of the other *ex post facto* categories.

Changes in trial or appellate procedure that had consequences far more disadvantageous to the defendant than the change to Maryland's § 413 have been held not to offend the *ex post facto* clause. *See Collins; Dobbert v. Florida,* 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977); *Evans v. Thompson,* 881 F.2d 117 (4th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 3255, 111 L.Ed.2d 764 (1990); *United States v. Mest,* 789 F.2d 1069 (4th Cir.1986), *cert. denied,* 479 U.S. 846, 107 S.Ct. 163, 93 L.Ed.2d 102 (1986). In *Collins,* for example, a change in the Texas law of jury sentencing in noncapital cases permitted a reviewing court to reform an improper verdict by deleting a punishment not permitted by law whereas, under the law at the

---

**10.** For example, a juror who finds that the defendant was intoxicated and who is instructed that intoxication is to be considered as a mitigating circumstance but who personally believes that intoxication does not excuse responsibility for one's conduct, will give very little weight in the balancing process to intoxication when honoring a statutory declaration that it is a mitigating circumstance.

time of the offense, the result of an improper sentencing verdict was a new trial. Applying this change on review of a sentence improperly imposed prior to the change was not an *ex post facto* violation.

Of more significance here is that *Collins* overruled *Kring v. Missouri*, 107 U.S. 221, 2 S.Ct. 443, 27 L.Ed. 506 (1883). In *Kring*, the prosecutor and trial court accepted a defendant's plea of guilty to second-degree murder which, under state law at the time of the homicide, operated as an acquittal of the companion first-degree murder charge. The defendant, however, appealed the sentence, and the Supreme Court of Missouri reversed and remanded. The relevant state law had changed after the crime, but before the defendant entered his plea. On retrial Kring was prosecuted for first-degree murder, over his objection, and was sentenced to death. In *Kring* the United States Supreme Court reversed. In overruling *Kring*, *Collins* points out that "Missouri had not changed any of the elements of the crime of murder, or the matters which might be pleaded as an excuse or justification for the conduct underlying such a charge; it had changed its law respecting the effect of a guilty plea to a lesser included offense." 110 S.Ct. at 2723.

In *Dobbert*, a jury in a death penalty case recommended life imprisonment by a ten-to-two majority. The trial judge overruled the jury and imposed a sentence of death. Under the law in effect at the time of the murders, a jury's recommendation was binding on the trial judge. Under the law at the time of trial the jury's view was advisory. The Supreme Court found no *ex post facto* violation, because "[t]he new statute simply altered the methods employed in determining whether the death penalty was to be imposed; there was no change in the quantum of punishment attached to the crime." 432 U.S. at 293–94, 97 S.Ct. at 2298.

*Evans v. Thompson* involved a change in Virginia's death-sentencing law that permitted that Commonwealth again to seek the death penalty in a new sentencing proceeding after a death sentence, previously imposed, had

been vacated when reviewed for error. Under the law in effect at the time of the murder, vacating a death sentence for procedural error automatically effected a sentence of life imprisonment. The Court noted that the change in the Virginia statute "does no more than change the procedures surrounding the imposition of the death penalty.... When the offense was committed, [it] was an offense for which the death penalty could be imposed. Fair warning of punishment was thus afforded petitioner." 881 F.2d at 120 (citations omitted).

*United States v. Mest* involved an insanity defense in a murder prosecution. The murder was committed prior to the enactment by Congress of the Comprehensive Crime Control Act of 1984, which included the Insanity Defense Reform Act of 1984. 789 F.2d at 1071 n. 1. The statute changed the Federal Rules of Evidence, with the result that the defendant's psychiatric expert was prohibited from stating an opinion whether the defendant could "discern the wrongfulness of his behavior and had the capacity to conform his behavior to the requirements of the law should he have so chosen." *Id.* at 1071. The Court reasoned that the change in the Rules of Evidence

> "does not receive less or different testimony in order to convict the offender but, rather, changes the style of question and answer that can be used to establish both the offense and the defense thereto. Every actual fact concerning the mental condition of the defendant presentable by the defense's psychiatrist or, for that matter, the government's psychiatrist is still as admissible and as required after the enactment ... as before. The change, rather, is to whether either of these categories of witnesses can instruct the trier of fact ... as to what its findings should be on the factual questions about which the witness could before and can now testify."

*Id.* at 1071–72 (footnote omitted).

Following the change in the Maryland statute the defendant continues to have the burden of producing evidence on intoxication and of persuading as many jurors as possible to

find as a fact that the defendant was intoxicated. The change affects only the procedure for determining whether the fact, if found, is mitigating. It is absolutely clear that amended § 413 does not remove intoxication as a potential mitigating circumstance in death penalty proceedings. The preamble to the amending act declares:

> "The General Assembly is aware that the Supreme Court has held that evidence of the intoxication of a defendant in a case involving the death penalty must be allowed and considered as a factor in mitigation. The General Assembly further believes that such mitigating factor should be considered under the eighth mitigating factor and not highlighted specifically so as to appear more as justification than as one of the many factors that may be considered as possible mitigation. In striking the word intoxication from the fourth mitigating factor, the General Assembly is not eliminating the consideration of intoxication but altering the emphasis presently indicated...."

Chapter 296 of the Acts of 1983.[11] In the instant matter, intoxication as a potential mitigating circumstance was presented to the jury. The trial judge properly instructed: "You are not to consider, I repeat, you are not to consider intoxication from alcohol or drugs in mitigating circumstance Number 4. You may, however, consider that in mitigating circumstance Number 8, if you so choose."

The amendment to § 413 did not change the fact that first-degree murder during commission of a robbery was punishable by death, a fact of which pre-existing Maryland law gave Booth clear notice. *See Dobbert*, 432 U.S. at 297–98, 97 S.Ct. at 2300 (death penalty law in effect at time of murders and later found unconstitutional nevertheless "clearly indicated Florida's view of the severity of murder and of the degree of punishment which the legislature wished to impose"); *Grandison v. State*, 305 Md. 685, 754,

---

11. The Legislature may have desired to avoid giving the appearance of equating voluntary intoxication with involuntary mental illness.

506 A.2d 580, 614 (change specifying impact statements from families of murder victims to be used in capital sentencing did not change the "quantum of punishment attached to the crime"), *cert. denied,* 479 U.S. 873, 107 S.Ct. 38, 93 L.Ed.2d 174 (1986); *Booth II,* 306 Md. at 222, 507 A.2d at 1123–24 (same); *Tichnell v. State,* 287 Md. 695, 737, 415 A.2d 830, 852 (1980) (even if Maryland statute were unconstitutional before addition of catch-all mitigation instruction, statute gave defendant "fair warning as to the degree of culpability which Maryland ascribes to the act of murder"); *Evans,* 881 F.2d at 120. The amendment did not remove any factors from the jury's consideration in finding mitigation; nor did it make inadmissible any previously admissible evidence. *See United States v. Mest,* 789 F.2d at 1071–72; *see also Collins,* 110 S.Ct. at 2719 n. 3.

None of the purposes of the prohibition against *ex post facto* laws would be served by applying the prohibition here. In *Weaver v. Graham,* 450 U.S. 24, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981), the Supreme Court, in a case involving punishment additional to that prescribed at the time of the offense, identified two principal protections the clause affords. First, "the Framers sought to assure that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed." 450 U.S. at 28–29, 101 S.Ct. at 964. As we have already pointed out, § 413 gave fair warning that first-degree murder in the commission of a robbery was potentially punishable by death. To paraphrase Professor Tribe in his discussion of *Dobbert,* "[Booth's] reliance interest [on the benefits of being intoxicated while he murdered] hardly deserves mention, let alone respect." *See* L. Tribe, *American Constitutional Law* § 10–3, at 640 (2d ed. 1988).

Second, "[t]he ban also restricts governmental power by restraining arbitrary and potentially vindictive legislation." 450 U.S. at 29, 101 S.Ct. at 964. Even murderers "are entitled to something better than a legislative lynching." L. Tribe, *supra,* at 640. But in this case, as in *Dobbert,* there was no actual risk of legislative abuse. House Bill 62,

which later became Chapter 296 of the Acts of 1983, was pre-filed in the 1983 legislative session. The bill was introduced in the House of Delegates on January 12, 1983. It passed the House on March 23 and in the Senate on April 6, 1983. The Attorney General approved the bill for constitutionality and legal sufficiency on May 11, 1983. The Bronsteins were murdered on May 18. The only action taken on the bill after the murders was its signing by the Governor. Plainly the Legislature could not have, and did not, contemplate John Booth when it deleted intoxication as an express mitigating circumstance on the sentencing form. *See also* L. Tribe, *supra*, at 640 n. 26 (speculating that legislation adding an aggravating circumstance in response to the events of a particular murder still might not violate the *ex post facto* ban if the amendment were drawn "in terms broad enough to encompass not just the particular individual who is ultimately convicted of the specific killing at issue but anyone else who meets similar criteria").

Booth argues that, notwithstanding the federal cases, this Court has twice decided that procedural changes violated the *ex post facto* ban. He relies on *Gluckstern v. Sutton,* 319 Md. 634, 574 A.2d 898, *cert. denied,* —— U.S. ——, 111 S.Ct. 369, 112 L.Ed.2d 331 (1990), and *Anderson v. Department of Health & Mental Hygiene,* 310 Md. 217, 528 A.2d 904 (1987), *cert. denied,* 485 U.S. 913, 108 S.Ct. 1088, 99 L.Ed.2d 247 (1988). Neither case dealt with procedural changes in the criminal trial at which the sentence was imposed—the type of changes with which we are here concerned. Rather, they dealt with changes which had the effect of "mak[ing] more burdensome the punishment for a crime." *Collins,* 497 U.S. at ——, 110 S.Ct. at 2719.

*Anderson* concerned a defendant who, as a consequence of having been found not guilty of first-degree murder by reason of insanity, was committed to a mental institution under an earlier statute. When Anderson sought an administrative release, a circuit court ruled that the new statute, which placed the burden of proving competency on the inmate, applied. This Court held that Anderson's commit-

ment was "the 'disposition' portion of the judgment in the criminal case," so that the *ex post facto* clause was implicated. 310 Md. at 224–25, 528 A.2d at 908. United States Supreme Court decisions were reviewed, including *Weaver v. Graham, supra,* holding that a disadvantageous change in calculating good time credits which was applied to a convict whose crime was committed before the change, violated the *ex post facto* clause. *Anderson* concluded:

> "These opinions indicate that a law passed after the commission of a criminal act, affecting substantial rights, and *changing the consequences* of having committed the criminal act in a way that is disadvantageous to the defendant, falls within the ex post facto prohibition."

310 Md. at 227, 528 A.2d at 909 (emphasis added). "Because the change in the law concededly operate[d] to Anderson's disadvantage" with respect to possible release from criminal confinement, we held that the *ex post facto* prohibition was offended. *Id.* at 230, 528 A.2d at 911.

In *Gluckstern,* the relevant change in law added a disadvantageous requirement for an inmate at Patuxent Institution to obtain parole. In addition to approval by the Institutional Board of Review, inmates serving life sentences were required to obtain the approval of the Governor. Sutton, who was sentenced to life imprisonment plus twelve years, was able to obtain the approval of the Board of Review but not that of the Governor. We held that the State could not prevent his parole if the Board of Review alone recommended it.

*Gluckstern* distinguished *Dobbert,* 432 U.S. 282, 97 S.Ct. 2290, relied on by the State in *Gluckstern,* on the ground that "*Dobbert* involved a change in trial procedure whereas the present case involves a change in parole requirements." 319 Md. at 670, 574 A.2d at 916. Booth's case, of course, involves a change in trial procedure.

For all these reasons, the changes to § 413 do not violate *ex post facto* prohibitions.

## VI

### Allocution

■ Booth asserts that the trial court's instruction on allocution, coupled with part of the prosecutor's rebuttal argument, unfairly denigrated Booth's allocution. Cited in support of the argument is *Harris v. State*, 312 Md. 225, 539 A.2d 637 (1988) (*Harris V*). There is no error because Booth, through counsel, consented to the instruction. In any event, *Harris V* is inapplicable.

In *Harris V* the defendant allocuted after the last sworn witness had testified in the defendant's case at sentencing. There was no rebuttal so that the jury instructions followed the close of the defense presentation. *Harris v. State*, No. 30, Sept. Term, 1987, Joint Record Extract Vol. 7, at 740–50.

In *Harris V* the court instructed the jury concerning allocution as follows:

> " 'A Defendant has a common law right of allocution, i.e., to address the sentencing body in mitigation of punishment, however, his statement in allocution is not evidence or testimony. During allocution the Defendant is not under oath, and thus not subject to the penalties of perjury and to cross-examination.
>
> "Any statement Jackie Harris makes to you should not be regarded as evidence but rather as his statement in mitigation of punishment.' "

*Harris V*, 312 Md. at 254, 539 A.2d at 651. But, in that same charge the court had instructed the jury "that it was 'to decide the case only on ... evidence.' " *Id.* We said that, under those circumstances, the above-quoted instruction "in effect told the jury that it should disregard any facts stated during allocution, because those facts were not evidence or testimony." *Id.*

The case before us does not present the problem that occurred in *Harris V*. Here, Booth did not allocute during the testimony phase of the sentencing proceeding. Here, after the testimony phase counsel and the court discussed the instructions which the court proposed to give and which

had been furnished in writing to counsel. Those instructions contained nothing about allocution, because, as counsel were expressly advised, the trial court intended to reserve instructing on allocution until Booth elected whether or not to allocute.

In the general, introductory phase of its instructions the court told the jury that it must consider only evidence, and that evidence included testimony, exhibits, and stipulations, but did not include the indictment, matters ruled inadmissible or stricken, questions, objections, and arguments of counsel. The jury was cautioned not to be influenced by questions or comments from the court during the course of the proceedings. Then the court instructed that "[o]pening statements and closing arguments of the lawyers are not evidence in this case."

Following the court's charge, the State argued. At the conclusion of that argument, in the course of a bench conference on scheduling, defense counsel mentioned that Booth would allocute in the middle of the defense closing argument. When the scheduling arrangements were resolved, the court asked for language on allocution "for me to add to my final instructions." The State asked that the jury be told that allocution is not evidence, not under oath, not subject to cross-examination, and "is presented at this phase of the trial for whatever purpose, if any, [the jurors] find appropriate."

The court then specifically asked defense counsel if he had "any objection to that," to which defense counsel replied: "Actually, no. We would not have any objection to that."

Before defense counsel began his summation the court told the jury that during the course of that argument Booth would be permitted to address the jury in allocution, that it was not testimony, not evidence, and not under oath, but that it was in the "same genre as the arguments of counsel." The court told the jury that it "may use [the allocu-

tion] for whatever purpose you deem appropriate...."
There was no objection to this supplemental charge.

Defense counsel opened the summation by arguing the first-degree principalship issue, then Booth allocuted, and counsel concluded with mitigation arguments. Booth read his allocution from a prepared statement, in which he denied stabbing either Mr. or Mrs. Bronstein and in which he confirmed much of the personal history to which others had testified for purposes of possible mitigation.

In the course of its rebuttal, the State reminded the jury that allocution is not evidence, calling it "a strange hybrid of information, be it true or false, and [of] argument." There was no objection by the defense to that characterization.

■ This factual review demonstrates that the problem presented in *Harris V* and more recently in *Hunt v. State*, 321 Md. 387, 438–41, 583 A.2d 218, 243–44 (1990), *cert. denied*, —— U.S. ——, 112 S.Ct. 117, 116 L.Ed.2d 86 (1991), is not found here. When the court instructs the jury to consider only the evidence and that allocution is not evidence, after the jury has heard both evidence and allocution, there is the obvious risk that the jury may be led to eliminate allocution from its consideration of potentially mitigating circumstances. That is why in *Hunt* we commented that "the court should not have told the jury that 'allocution is not evidence or testimony.'" 321 Md. at 441, 583 A.2d at 244. That risk is not presented here. When the court in this case charged that the jury should consider only the evidence, there was no allocution before the jury and, indeed, the court did not know whether there would be allocution. Then, after the charge and after the State's summation-in-chief when the court learned that there would be allocution, the judge gave a supplemental instruction that was limited solely to allocution. Although the court instructed that allocution was not evidence, it also specifically told the jury that it "may use [the allocution] for whatever purpose you deem appropriate." In the context it

was sufficiently clear that the supplemental instruction dealt with a special rule, peculiarly applicable to allocution, under which the jury, in its discretion, could use allocution for any purpose the jury deemed appropriate.

Further, even if the general instructions could reasonably be read into the special instruction later given on allocution, Booth's argument on the allocution instructions does not require even a plain error analysis. *Compare Franklin v. State,* 319 Md. 116, 126, 571 A.2d 1208, 1212–13 (1990). This is because there is more here than the simple lack of an objection to the instruction as given. Here defense counsel affirmatively advised the court that there was no objection to the instruction which the court immediately thereafter gave to the jury. Error, if any, has been waived. *See Mills v. State,* 310 Md. 33, 40, 527 A.2d 3, 6 (1987) (defense counsel's statement that jury is acceptable waives claimed error in voir dire process), *vacated on other grounds,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988); *Booth II,* 306 Md. at 185, 507 A.2d at 1105 (same); *Thomas v. State,* 301 Md. 294, 310, 483 A.2d 6, 14 (1984) (same), *cert. denied,* 470 U.S. 1088, 105 S.Ct. 1856, 85 L.Ed.2d 153 (1985); *White v. State,* 300 Md. 719, 729–31, 481 A.2d 201, 205–07 (1984) (same), *cert. denied,* 470 U.S. 1062, 105 S.Ct. 1779, 84 L.Ed.2d 837 (1985); *Calhoun v. State,* 297 Md. 563, 579–80, 468 A.2d 45, 52 (1983) (same), *cert. denied,* 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984).

Finally, if the jurors reasonably could have incorporated the general instructions into the special instruction on allocution, then it was incumbent on Booth's counsel to object or to request a more complete instruction under which the matter would be clarified further. That was not done, but the failure to do so did not deprive Booth of a fair trial. *See Franklin, supra.* The substance of the matters in mitigation referred to by Booth in allocution had in general been covered by other defense witnesses.

## VII

### Hypothetical Question

At the sentencing hearing Booth called Dr. Norman Karl, a licensed psychologist, who testified that he had administered a battery of psychological tests to Booth and had determined, among other things, that Booth suffered from a "borderline personality disorder." Dr. Karl testified that he based his opinion entirely on the test results and he purposely ignored other information regarding Booth. On cross-examination, the following colloquy occurred:

"PROSECUTOR: Would it surprise you to find, back in 1984 or shortly after—

"DEFENSE COUNSEL: Objection.

"THE COURT: Overruled.

"PROSECUTOR: During the allocution, on page 15—

"DEFENSE COUNSEL: Objection, Your Honor.

"THE COURT: Overruled.

"PROSECUTOR: —the Defendant described himself as 'I am not insane. I do not think there is nothing wrong with me, except that I have normal anti-social behavior patterns.'

"DEFENSE COUNSEL: Objection.

"THE COURT: Overruled.

"DR. KARL: I don't think Mr. Booth can make that diagnosis."

Characterizing the prosecutor's question as a hypothetical, Booth argues that the prosecutor impermissibly assumed facts not in evidence in contravention of a rule created by our prior cases.

Booth relies on *Commonwealth Bank v. Goodman,* 128 Md. 452, 464, 97 A. 1005, 1010 (1916) ("Questions asked an expert on cross-examination ought to be based upon facts proved and ought not to assume facts of which there is no evidence.") *and Holy Trinity Russian Independent Orthodox Church v. State Roads Comm'n,* 249 Md. 406, 414, 240 A.2d 255, 259 (1968) (not error for trial judge to exclude cross-examination question to expert without proper foun-

dation or proffer). *Compare Thomas v. Fidelity & Casualty Co.*, 106 Md. 299, 317, 67 A. 259, 261 (1907) ("The rule that a hypothetical question to an expert witness must be based upon facts proved in the case, does not apply to cross-examination.").

Resolution of this seemingly conflicting language in our cases is not required to decide the issue here. The party propounding a hypothetical question may include therein facts which are in evidence at that time, or which that party is able to prove at a later time in that party's case. *See State ex rel. Stickley v. Critzer*, 230 Md. 286, 290, 186 A.2d 586, 588 (1962). Here the matter incorporated into the State's question was a statement by the party opponent, Booth. That statement clearly could be proved through the transcript of Booth's allocution at the prior sentencing. That transcript is a part of the records of the Circuit Court for Baltimore City in this very criminal cause.

Thus, analyzing the issue on the ground Booth assigns here for the general objection made at sentencing, the trial judge did not abuse his discretion by allowing the prosecutor to incorporate Booth's prior statement of his own mental condition. The question included the reference to the page in the transcript of the prior proceeding where Booth's statement, which the State quoted, could be found. This customary courtesy between counsel gave defense counsel the opportunity to verify the accuracy of the quotation. It became unnecessary for the State later to introduce the transcript of Booth's prior statement because Dr. Karl did not take the bait. And, as the court instructed, the factual material incorporated into the question was not evidence.

Nor was Booth's statement irrelevant or unduly prejudicial. The jury already knew that Booth had previously been tried and convicted of the Bronstein murders. Dr. Karl had testified that he diagnosed Booth with a borderline personality disorder, and even hinted at mild brain damage, without ever interviewing Booth. The State was entitled to

attempt to place that opinion in perspective by gauging Dr. Karl's reaction to a seemingly contradictory opinion expressed by the defendant himself much nearer the time of the murders. *See Hunt v. State,* 321 Md. at 426–28, 583 A.2d at 237–38.

## VIII

### Sufficiency of Evidence on Principalship

Here we consider the sufficiency of the evidence that Booth was a principal in the first degree to the murder of Irvin Bronstein. Principalship was an issue because the evidence disclosed the presence of a second person, Willie "Sweetsie" Reid (Reid), at the crime scene. *Compare Wiggins,* 324 Md. at 570–72, 597 A.2d at 1368–69. At the hearing, Booth contended that his accomplice, Reid, or possibly some other person, stabbed both of the Bronsteins. The State's theory was that Booth stabbed Mr. Bronstein and Reid stabbed Mrs. Bronstein.

### A

Booth argues that the evidence as a whole was insufficient to prove that theory beyond a reasonable doubt. The standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979); *Tichnell v. State,* 287 Md. 695, 717, 415 A.2d 830, 842 (1980). That standard was met.

The State presented the testimony of Jewell Booth, who married the defendant a few weeks after the murders. Mrs. Booth testified to the following conversation she had with Booth shortly after the murders:

"MRS. BOOTH: After, I don't know how many times I asked him the different questions. I think I might have just been asking them one after another, constantly back at him. He was unfolding the bed. I came right out and

I asked him again what had happened to the people, did he know. He said 'No,' and I said 'Are you sure? Did you kill those people? Were they dead?' something like that, and he said that he—at first he said he didn't know, then he said, when I asked him 'Did you kill the people' or something like that, he said 'Well, yeah. Sure. Sure I did. Sweetsie,' I am not too sure, but I think he said Sweetsie killed the woman and he killed the man and then he went into this ridiculous statement about his grandmother.

"PROSECUTOR: What was your reaction to John's statement that he killed the man and that Sweetsie killed the woman?

"MRS. BOOTH: I looked at him and, see, he was—it was so stupid, because he had brought up—I looked at him like he was crazy because of what he had said to me."

The State also presented the prior recorded testimony of Veronda Mazyck, the girlfriend of Reid. She had asked Booth why "you all"—referring to both Booth and Reid—killed the Bronsteins. Mazyck said that Booth replied, "because they knew me and my nephew." Eddie Smith, who was acquainted with both Reid and Booth, testified that Reid told him in Booth's presence shortly after the murders that "we [referring to Reid and Booth] or he [referring to Booth] just killed a couple mother fuckers." Smith was unsure about the subject of Reid's sentence. Smith did not think that Reid had said, "I just killed a couple MFs."

The State also presented circumstantial evidence on Booth's principalship. There was evidence that the wound patterns on the two bodies were substantially different, which tended to show that two separate people did the killings. There was evidence showing that the Bronsteins knew and could identify Booth but not Reid, which suggested that Booth had the greater motivation for murdering the couple. There was, of course, substantial evidence that Booth was involved in the robbery of the Bronsteins' home.

The essence of Booth's argument on principalship—other than attacks on the credibility of the witnesses against him—was that the State ignored various forensic clues which might have proved that Booth did not do the stabbing. For instance, Booth presented a former medical examiner who testified that the police did not perform a relatively simple test on blood found on one of the knives at the murder scene. Had they done so, they might have found evidence suggesting that the same knife was used in both murders. The suggestion, presumably, was that the police and prosecutors limited their investigation lest they develop clear proof that Booth was not a first-degree principal. Our independent review of the record, however, reveals that a reasonable trier of fact could have concluded beyond a reasonable doubt that Booth was a first-degree principal.

### B

Booth constructs an elaborate theory that Jewell Booth was his accomplice in the murders. Because the State allegedly proved principalship solely on her testimony Booth says that he was improperly "convicted" of being a first-degree principal on the uncorroborated testimony of an accomplice. *See Turner v. State,* 294 Md. 640, 452 A.2d 416 (1982); *Luery v. State,* 116 Md. 284, 81 A. 681 (1911). According to Booth, when Mrs. Booth returned to the Bronstein home with Booth, Reid, and Mazyck several hours after the murders and participated in looting the premises, she became an accomplice in the robbery for which Booth was convicted. Her liability for robbery, Booth contends, also made her liable for the murders under the felony-murder doctrine. We need not consider the logical problems with this theory, nor need we reach the question of whether the corroboration requirement is applicable in a sentencing proceeding. It is enough to point out, as we did in the preceding subsection, that Mrs. Booth's testimony on principalship *was* corroborated. *See Collins,* 318 Md. at 280, 568 A.2d at 6 ("Not much in the way of

evidence corroborative of the accomplice's testimony has been required by our cases.") (quoting *Brown v. State*, 281 Md. 241, 244, 378 A.2d 1104,. 1107 (1977)).

## IX

### Instruction on Joint Principals

■ Giving the following instruction is challenged.

"A principal in the first degree, again, is the immediate perpetrator of the crime while a principal in the second degree is one who did not commit the crime with his own hands, but was present aiding and abetting the perpetrator.

"Under Maryland law, only a principal in the first degree may be sentenced to death.

"You are further instructed that if you find from the evidence that two people inflicted the fatal wound, you may find that they are joint principals in the first degree."

Booth concedes that this is a correct statement of law; nonetheless, he says it was not "applicable in light of the evidence before the jury." *See Johnson v. State*, 303 Md. 487, 512, 495 A.2d 1, 13 (1985), *cert. denied*, 474 U.S. 1093, 106 S.Ct. 868, 88 L.Ed.2d 907 (1986); *Sergeant Co. v. Pickett*, 285 Md. 186, 194, 401 A.2d 651, 655 (1979).

The instruction was generated by evidence, most of which was elicited through the defendant's witness, Dr. William Brownlee, a former deputy medical examiner for the District of Columbia. Dr. Brownlee testified that the wounds inflicted on Mrs. Bronstein were consistent with their having been made by a certain bent knife found under or next to her body. There was a nick on the blade of that knife. The witness also testified that the wounds to Mr. Bronstein were consistent with having been made by the same bent knife. Under questioning by the prosecutor and the court, Dr. Brownlee said that the nick on that knife was caused by something metallic, possibly a knife. The fact that Dr. Brownlee himself did not hold the opinion that the nick was

created by another knife is not determinative. He acknowledged that "[i]t would be a hypothesis" that the nick was caused by striking another knife "at the same time of the perpetration." Because there was other evidence sufficient to show that Booth stabbed Mr. Bronstein, there were sufficient inferences from Dr. Brownlee's evidence to permit instructing the jury on the legal effect of a finding, if any, that Booth and another jointly stabbed Mr. Bronstein.

## X

### Qualifying Expert Witnesses

Booth called four witnesses as experts at the sentencing hearing. We are concerned here with three: Dr. Donald R. Jasinski, a medical doctor who was offered as an expert on chemical dependence; Dr. Norman J. Karl, a licensed psychologist who was offered as an expert on the psychological state of Booth; and Ms. Cessi Alphonso, a social worker who was offered as an expert on "psychosocial assessments and the impact of a person's immediate family and immediate environment on his or her psychosocial development." At the conclusion of the direct and cross-examinations on each of these witness's qualifications, the defense offered each as an expert. The judge responded that he would rule on questions as they were asked. Booth argues that because the court did not announce that it unqualifiedly accepted these witnesses as experts, the court improperly diminished the weight of their testimony in the eyes of the jurors, and, presumably, that we should reverse the judgment on that basis. The argument is devoid of merit.

All three witnesses testified at length. Each gave opinion evidence to each question propounded that was designed to elicit opinion evidence, with the arguable exception of one question. Significantly, Booth does not point to the proffer of any evidence that was kept from the jury by the alleged refusal to accept the witnesses as experts.

In essence, the trial judge's technique of ruling on individual questions does not differ from what a judge ordinarily

does after ruling that a witness is "qualified" as an expert. Even then the court must rule on objections involving the scope of the witness's expertise. *See Evans v. State,* 322 Md. 24, 34, 585 A.2d 204, 208–09 (1991) (trial judge not required to permit a qualified expert to express an opinion on any matter within the expert's field); *Simmons v. State,* 313 Md. 33, 42, 542 A.2d 1258, 1262 (1988) ("even though a trial judge has ruled to allow an expert to testify in general terms, the trial judge must engage in a separate evaluation of the admissibility of an expert opinion").

 Booth refers to one instance where the trial judge ruled, in a sidebar conference, that Ms. Alphonso could not show the jury a detailed diagram of Booth's family tree which she had prepared in advance of trial. Booth cites the following statement from the judge's ruling as an example of his failure to qualify Ms. Alphonso as an expert:

"I also have some concerns about having someone offered as an expert after being told not to prepare a written report. It looks as if it was done for the express purpose of preventing the State from knowing what the witness was going to say, and I am not going to permit her to testify as an expert, Counsel."

This statement is taken out of context by Booth. The substance of the judge's ruling on this point was that the diagram was a written report of an expert, and since the defense had not made it available to the State the defense would not be allowed to use the diagram. *See* Maryland Rule 4–263(d)(2). This was not a ruling that Ms. Alphonso was not an expert. Implicitly it was a ruling that she was an expert because the purpose of the colloquy was in part to decide whether the diagram constituted an expert's report. *See id.* Later in this same colloquy the judge made clear his ruling on Ms. Alphonso's qualifications as an expert:

"Ms. Alphonso has been offered by the defense as an expert witness in this case and the Court has not accepted her as an expert at this point. The Court will rule on

each question as it is asked, as to whether or not it is proper or appropriate.

" . . . .

"I will not certify her as an expert and permit her to just simply, without any further question, give her opinion. Her opinion is going to probably be permitted in some instances and may not in others, depending upon each individual question. . . ."

Ms. Alphonso went on to give an opinion concerning how Booth's family life and environment had affected him.[12]

### XI

### Control of Narrative Testimony

During her direct examination, Ms. Alphonso mentioned truancy and stealing by Booth as a child. Defense counsel asked whether Booth had ever been caught. When Ms. Alphonso said that he had, counsel asked, "And could you tell us what happened?" Ms. Alphonso replied, "Well, then, he became, he was truant. He eventually got caught and he was then placed in the Boys' Village, where he was raped." The court sustained the prosecutor's general objection and granted his motion to strike, telling the jurors to "disregard that last remark as being totally unresponsive." Booth now claims that the court's ruling was reversible error because the expert's answer was responsive and it constituted important, admissible evidence.[13]

---

**12.** For this reason, even if Booth's brief is read as arguing that the application of Maryland Rule 4–263(d)(2) was erroneous, the error is harmless beyond a reasonable doubt.

**13.** The problem presented here is the converse of the more typical situation in which the nonquestioning party appeals from the denial of a motion to strike, as unresponsive, all or a portion of a witness's answer. In *Standard Gas Equip. Corp. v. Baldwin,* 152 Md. 321, 325, 136 A. 644, 645 (1927), we said that "[a]s a rule, it is not a matter of right to have answers stricken out because not responsive, if otherwise unobjectionable, except at the instance of the questioner." *See also* L. McLain, *supra,* § 611.2, at 131 ("Only questioning counsel . . . has the right to object on the ground solely that an answer is nonresponsive."); J. Murphy, *supra,* § 103, at 10 ("If the answer is both

▆▆▆▆

▆▆▆ The court in the instant matter explained that the basis for its ruling was limited to the unresponsiveness of a portion of the answer given in relation to the question that had been asked. Nothing prevented counsel for Booth from asking a more narrowly tailored question to elicit the desired answer from Ms. Alphonso, or from calling Booth to testify based on personal knowledge. Thus, the error, if any, has been waived. *See Dietz v. Moore,* 277 Md. 1, 9, 351 A.2d 428, 433 (1976) (parties "can hardly urge on appeal what they themselves failed to elicit.").

Further, the error, if any, is harmless beyond a reasonable doubt. In Ms. Alphonso's field of expertise she forms opinions based on information obtained from interviewing the subject of the inquiry and persons who know the subject of the inquiry. The information obtained was hearsay when admitted into evidence through Ms. Alphonso. Presumably the trial court was permitting this hearsay to be admitted on the ground that it was information reasonably relied upon by experts in the field. *See Consolidated Mechanical Contractors v. Ball,* 263 Md. 328, 336, 283 A.2d 154, 158 (1971). Under that rule the hearsay is admitted, not as proof of the underlying facts, but simply as the basis for the opinion by the expert. *Maryland Dep't Human Resources v. Bo Peep Day Nursery,* 317 Md. 573, 589, 565 A.2d 1015, 1023 (1989), *cert. denied,* 494 U.S. 1067, 110 S.Ct. 1784, 108 L.Ed.2d 786 (1990); *Ellsworth v. Sherne Lingerie, Inc.,* 303 Md. 581, 603, 495 A.2d 348, 359 (1985); *Attorney Grievance Comm'n v. Nothstein,* 300 Md. 667, 679, 480 A.2d 807, 813 (1984). Here, Booth has not shown that any opinion which Ms. Alphonso was prepared to express was excluded from evidence because of the exclusion, as unresponsive, of the hearsay concerning the rape of Booth. The argument is that the weight of Ms. Alphonso's opinion was reduced because one factor of its foundations

---

nonresponsive *and otherwise inadmissible,* any counsel may move to strike."). *See also 3 Wigmore on Evidence* § 785, at 201 (Chadbourn rev. 1970).

was missing. On the facts here, so ephemeral a claim of prejudice is speculative.

## XII

### Character Opinion Exclusion

Mazyck, the former girlfriend of Reid, was one of the persons who returned to loot the Bronstein home after the murders. Mazyck had testified in person for the prosecution at Booth's second trial. Because Mazyck was unavailable for the sentencing proceeding at issue here, prosecutors read her prior testimony into evidence.

Booth called Pamela Smith (Smith), a probation agent, to testify about Mazyck's probation history and character. When Booth's counsel asked Smith for her personal opinion of Mazyck's veracity, the judge sustained the prosecutor's objections. Booth now argues that Smith's opinion should have been admitted under Md.Code (1974, 1989 Repl.Vol.), § 9–115 of the Courts and Judicial Proceedings Article and under our prior decisions. Section 9–115 in relevant part provides:

> "Where character evidence is otherwise relevant to the proceeding, no person offered as a character witness who has an adequate basis for forming an opinion as to another person's character shall hereafter be excluded from giving evidence based on personal opinion to prove character...."

The claim of error has not been preserved. Booth did not proffer what opinion, if any, the witness was prepared to state.

Even if the claim of error were preserved, our cases have made clear that the trial judge decides whether the witness has an "adequate basis" before the opinion is stated. An appellate court will not disturb the trial court's decision except for a clear abuse of discretion. *Hunt v. State,* 321 Md. at 423, 583 A.2d at 235; *Durkin v. State,* 284 Md. 445, 453, 397 A.2d 600, 605 (1979). There was no abuse of discretion here.

■ Mazyck was convicted of accessory after the fact to the Bronstein murders and sentenced to fifteen years suspended and five years probation. Smith, assigned as Mazyck's probation agent, first met with Mazyck on or after November 26, 1984. Smith testified that she had not seen Mazyck since October 7, 1985. There is no indication of how frequently Smith and Mazyck met during that period or how long their meetings lasted. There is no particular indication of what they discussed.

As Professor McLain has pointed out: "The preferable means for demonstrating before the jury that the witness has sufficient knowledge of the individual to form a worthwhile opinion would be merely to elicit proof of how long and how well the witness has known the individual." L. McLain, *supra*, § 405.3. The fact that Smith once was Mazyck's probation agent and currently had access to her file did not require the trial court to find that Smith had an adequate basis for expressing an opinion on Mazyck's veracity.

Smith did testify extensively about various documents and events recorded in Mazyck's file: a violation of probation hearing, a failure to complete her required community service, a subsequent burglary arrest, and continuing problems with drug and alcohol abuse. Smith's personal knowledge of these events was never established; indeed, many of them did not occur during the time Smith was assigned to Mazyck. Testimony and documentation on Mazyck's transgressions were admitted into evidence without objection, however, and the jurors were entitled to consider it in deciding whether to credit Mazyck's testimony. Absent any proffer that Smith's opinion would be based on anything other than Mazyck's poor probation record, the error, if any, is harmless beyond a reasonable doubt.

## XIII

### Closing Argument

■ Booth argues that comments made by the prosecutor in the rebuttal phase of the State's closing argument

require reversal. Where defense counsel unsuccessfully objected, we apply an abuse of discretion standard. "The permissible scope of closing argument is a matter left to the sound discretion of the trial court. The exercise of that discretion will not constitute reversible error unless clearly abused and prejudicial to the accused." *Booth II,* 306 Md. at 210–11, 507 A.2d at 1118; *see Thomas v. State,* 301 Md. 294, 316, 483 A.2d 6, 17 (1984), *cert. denied,* 470 U.S. 1088, 105 S.Ct. 1856, 85 L.Ed.2d 153 (1985). Where no objection has been made in a capital case, the rule was recently stated in *Jones v. State,* 310 Md. 569, 580–81, 530 A.2d 743, 748–49 (1987), *vacated on other grounds,* 486 U.S. 1050, 108 S.Ct. 2815, 100 L.Ed.2d 916 (1988).

> "[T]he mere fact that a remark made by the prosecutor to the jury was improper does not necessarily require a conviction to be set aside. Reversal is only required where it appears that the remarks of the prosecutor actually misled the jury or were likely to have misled or influenced the jury to the prejudice of the accused. *Wilhelm* [*v. State,* 272 Md. 404, 415–16, 326 A.2d 707, 716 (1974)]; *Wood v. State,* 192 Md. 643, 652, 65 A.2d 316[, 320] (1949). Consistent with this rule, the Supreme Court has held that reversal is only required where the prosecution's remarks were focused, unambiguous and strong, and so prejudiced a specific right that to allow them to go uncorrected would deprive the accused of fundamental fairness. *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985)."

(Additional citations omitted.)

## A

To understand Booth's initial point takes us back into the testimony of a prosecution witness, Sergeant Lamartina. On cross-examination defense counsel asked if it were true that the police learned in the course of their investigation that someone other than Booth had admitted stabbing Mr. Bronstein and running out of the house and vomiting on the front lawn. The witness said: "That may be Darrall you

are talking about. That is the only other person that was indicated...." Defense counsel then unsuccessfully sought to refresh the witness's recollection with one page of a question and answer form of interview, in which neither the person interrogating nor the person answering were identified. Sergeant Lamartina explained that the person being interrogated "gave information he had overheard. This information was never actually corroborated.... It is not from the defendant himself or another suspect."

In closing argument by the defense, counsel's opening theme was the failure of the State to prove principalship beyond a reasonable doubt. A major part of that argument criticized the police investigation. Counsel recalled that it "came out on cross-examination, that during the investigation [the police] developed information that someone else had admitted to stabbing ... Mr. Bronstein, and the State did not bring that out to you."

In the same vein, while criticizing the "absence of forensic and scientific evidence," defense counsel argued that there were "No hairs, no fibers, no fingerprints, no blood.... No eyewitness." The jurors, of course, knew that Reid was an eyewitness.

Against that background, the State in rebuttal said:

"PROSECUTOR: It's different being a prosecutor than it is a defense attorney. You see, even in a hearing like this, we are bound by rules of evidence—

"DEFENSE COUNSEL: Objection, Your Honor.

"THE COURT: Overruled.

"PROSECUTOR: I can't come in here and tell you what anybody else had to say about this crime except John Booth. Mr. Hill would have you take into consideration the famous Sweetsie in his consideration; he would have you take into consideration the Defendant's nephew, Darrall Brooks. I can't come in here and show you evidence against them. I can't tell you everything that

they had to say. I just present the evidence against Mr. Booth and I present it in good faith."

Booth argues that the prosecutor was improperly suggesting evidence that he could have proved and incorrectly informing the jury that the prosecution and defense played by different rules that favored the defense.

■ The argument was proper rebuttal. The State was explaining that its case was focused on proof directed toward Booth, while the defense could generate hypotheses generally consistent with the evidence in an attempt to create a reasonable doubt. Further, the State was telling the jurors, in lay terms, that it generally could not introduce the statements of persons who were not party opponents.

## B

In the defense closing, counsel said:

"What is not an aggravating factor, Ladies and Gentlemen, is the heinousness of the crime, the severity of the crime, the brutality of the crime. Just the fact, simple fact, sad fact, that the murder was committed during the course of a robbery. That you may not consider as an aggravating factor the heinousness or the brutality or the horror of the twelve stab wounds makes no difference as far as the law is concerned."

The State, immediately following the portion of the State's rebuttal quoted in Part XIII.A, *supra,* responded:

"I will speak to you about the law. I will do everything I can not to misle[a]d you. Mr. Hill, in his closing argument to you, made one egregious, one outrageous, one absolute misstatement of the law. He said that you are not allowed to take into consideration the brutality, the heinousness and the cruelty of the crime for which you are sentencing the Defendant—

"DEFENSE COUNSEL: Objection.

"THE COURT: Overruled.

"PROSECUTOR: Ladies and Gentlemen, that is one hundred percent, no, that is one thousand percent ridiculous...."

██ Although the sole aggravating factor in this case was robbery, defense counsel's argument glided from that technically correct statement into telling the jury that "the horror of the twelve stab wounds makes no difference as far as the law is concerned." That was not correct. The jurors were entitled to consider the circumstances of the murder when weighing the aggravating factor against any mitigating factors. The State was entitled to disabuse the jurors of any possible misconception on that score generated by the defense comments.

### C

██ Recycled under the label of improper denigration by the State in argument of the defendant's right to allocution is the contention, answered in Part VI, *supra*, involving the court's instruction on allocution. There was no objection by the defense, and the argument did not deprive Booth of a fair trial. It is simply an argument that the jury should not accept what Booth had said in allocution. That was proper argument. *See Hunt*, 321 Md. at 436, 583 A.2d at 241–42; *Booth II*, 306 Md. at 199, 507 A.2d at 1112. The court had fully instructed the jury on what it could and could not consider, and the supplemental instructions made plain that allocution could be considered for whatever use the jury chose to make of it. *See* Part VI, *supra*.

### D

The final complaint with the prosecutor's rebuttal argument involves comments made about Booth's parents. The picture which the defense had painted of Booth's parents is illustrated by the following passage:

"This is ... a tragic story of a tragic family and a tragic childhood. An absentee father for John Booth, almost never there, an alcoholic when there. An alcoholic

mother. Parents who fought continuously when they were together, verbally cursing, mean, ugly, physically hitting each other, punching in front of the children."

In rebuttal the State argued:

"Had you met June Sparrow [Booth's mother] you would have realized that she is not the horrible person she is described—

"DEFENSE COUNSEL: Objection.

"THE COURT: Overruled.

"PROSECUTOR: Had you met John Booth [Booth's father], you would have seen that he is someone who, for all of his faults, provides a fabulous male role model for this defendant and did in his young, formative years and could have at any time, if that is what the defendant wanted."

Neither of Booth's parents testified at the sentencing hearing; most of the testimony about them came in through Ms. Alphonso, the social worker. Booth argues that the prosecutor was commenting upon facts not in evidence or stating what he could have proved.

The trial court did not abuse its discretion. Basically the State was presenting in an argumentative fashion the concept that Booth's parents were not the caricatures which the defense had sought to create. This was fair rebuttal. The jury had heard information that Booth's father had served in the Navy. During that period Booth and two of his siblings were born. When the father was discharged, the parents married, the father became one of the first African–American fire fighters in Baltimore City, and the couple purchased a home. The jury had also been told that, while the father was in the Navy, the mother worked as a domestic six or seven days a week, for long hours each day. Ms. Alphonso described Booth's father, at the time of her meeting with him, as a "sensitive, intelligent, highly educated man." One of Booth's sisters said that Booth's father held degrees in mechanical engineering and theology.

## XIV

### Recusal

By a pretrial motion Booth sought to have Judge Angeletti recuse himself. The motion was denied, and that denial is the basis for Booth's final contentions on this appeal. Booth submits that Judge Angeletti should have recused himself because: (A) he had been reversed twice before in this same case; (B) he had described the defendant to counsel as "amoral"; and (C) he indicated that he would rule on refiled pretrial motions in the sentencing in the same way as he had ruled in a prior sentencing. None of these arguments has any merit.

### A

"[I]n the absence of a constitutional or statutory provision to the contrary, the judge who presided at the trial of a case which is reversed on appeal and remanded for a new trial is not disqualified to retry the case." *Board of Medical Examiners v. Steward,* 203 Md. 574, 583, 102 A.2d 248, 252 (1954); *see also Thanos v. Superintendent,* 204 Md. 665, 667–68, 104 A.2d 926, 927 (1954); *Miles v. State,* 88 Md.App. 360, 594 A.2d 1208, *cert. denied,* 325 Md. 94, 599 A.2d 447 (1991). Booth relies on Canon 3C of the Maryland Code of Judicial Conduct, adopted well after our decision in *Steward,* as a contrary statutory provision. Canon 3C states that:

"(1) A judge should not participate in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:

(a) the judge has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding."

Knowledge gained from the "four corners" of a prior proceeding is not the "personal knowledge of a disputed fact" referred to in the canon. *See Boyd v. State,* 321 Md. 69, 581 A.2d 1 (1990); *Doering v. Fader,* 316 Md. 351, 355–57, 558 A.2d 733, 735–36 (1989).

 Booth's view is that, because of two prior reversals in this case, Judge Angeletti has a "personal stake" in the outcome of the case and will be moved to "engage in self-vindication." Brief of Appellant at 133. As a *per se* rule this argument contradicts our holdings in *Boyd, Fader, Steward,* and *Thanos.*

On the facts of this case the argument is frivolous. The first reversal in this long litigation was by a five-four decision of the Supreme Court of the United States in *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), after this Court had affirmed the judgment rendered in Judge Angeletti's court. The Supreme Court's *Booth* held, for the first time, that victim impact statements were inadmissible in capital sentencing proceedings. A few years later (after the sentencing proceedings below), the Supreme Court overruled its *Booth. Payne v. Tennessee,* — U.S. ——, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).

The second reversal resulted from our decision that trial courts, at the defendant's request, must admit evidence relating to parole eligibility in capital sentencings. *Doering v. State,* 313 Md. 384, 411–12, 545 A.2d 1281, 1295 (1988). *Doering* was decided after Judge Angeletti had presided over the resentencing of Booth involved in the second reversal. That resentencing was conducted according to then existing Maryland law. *See Booth II,* 306 Md. at 217–18, 507 A.2d at 1121. Booth had raised the *Doering* issue in his appeal from the resentencing and therefore we vacated Booth's death sentence in a summary order. *Booth III,* 316 Md. 363, 558 A.2d 1205. Trial judges have no need to vindicate themselves for lacking precognition.

### B

 For the subject sentencing proceedings a new team of attorneys was assigned as trial counsel for Booth. The motion for recusal avers that in a chambers conference with Judge Angeletti, held before new counsel had met Booth, Judge Angeletti told them that they would or might find

Booth to be "amoral." [14] Neither version of the remark required recusal. "Amoral" means "1 a: neither moral nor immoral ... [2]b: ethically neutral." *Webster's Third New International Dictionary* 72 (1976). At the hearing on the motion Judge Angeletti told counsel: "I am somewhat literate in the use of the English language, and if I wished to be pejorative [in] referring to someone, I know how to do that, and that was not done in this case, under any circumstances."

Even if we do not accept the foregoing, clinically antiseptic definition and consider the innuendo to have been that Booth was lacking in morality, that does not demonstrate a personal bias requiring recusal. Having presided over prior resentencing proceedings, Judge Angeletti was privy to Booth's record. His record as an adult begins in 1969 and reflects convictions and sentences of incarceration for interfering with a police officer, unauthorized use, robbery, assault with intent to maim, possession of marijuana, robbery, interfering with a police officer, indecent exposure, shoplifting, assault, assault with intent to maim, escape, a murder and armed robbery of a victim other than the Bronsteins, the murders and armed robberies of the Bronsteins, and escape. Faced with this record, counsel for Booth at a prior sentencing proceeding had called as a defense witness an associate professor of Christian ethics at a Roman Catholic Seminary. That witness told that jury that Booth " 'basically makes decisions much as a child would.' " *Booth II,* 306 Md. at 213, 507 A.2d at 1119. There is little difference between the substance of the

---

14. The motion for recusal was supported by an affidavit made by one of Booth's new attorneys. That affidavit is referred to in the motion and was referred to by participants at the hearing on the motion to recuse. The actual affidavit, however, is not in the record extract; nor do we find it in the original record. An assistant state's attorney who was present at the conference told the court at the hearing on the motion that he had no recollection of the statement, from which he concluded that, if made, it could not have been particularly noteworthy. Judge Angeletti's best recollection, expressed at the hearing, was that he might have said that counsel "might" find Booth to be amoral.

defense-initiated statement by the ethician and Judge Angeletti's comment to counsel.

In addition, Booth stood convicted of murder and that finding of guilt had been affirmed. Likewise, Judge Angeletti was not the sentencing authority; the jury was. These facts distinguish this case from *State v. Nordstrom*, 122 R.I. 412, 408 A.2d 601 (1979), relied on by Booth, where the trial judge, in the course of trial on guilt or innocence, referred to the defendants as " 'bad bastards.' " 408 A.2d at 602. Nor is Judge Angeletti's comment at all comparable to that of the Arkansas trial judge who should have recused himself from presiding over a resentencing in a capital case, as reported in *Walker v. Lockhart*, 763 F.2d 942 (8th Cir.1985), *cert. denied*, 478 U.S. 1020, 106 S.Ct. 3332, 92 L.Ed.2d 738 (1986), and cited by Booth. After granting the defendant's request to go to church to be baptized, that judge "had instructed the deputy sheriff that[,] if [the defendant] 'made a move[,] to shoot him down, because he didn't want him brought back to him because he intended to burn the S.O.B. anyway.' " *Id.* at 946. *United States v. Womack*, 454 F.2d 1337 (5th Cir.1972), which Booth cites, is also factually distinguishable. There the judge, before trial, told counsel that, based on the evidence in the trial of a co-defendant, the court was convinced the defendant was guilty and that the only way the defendant would receive favorable treatment would be by saving the government the expense of a trial.

## C

Booth's claim that the trial judge stated that he would issue the same rulings on all pretrial motions as he had in the prior proceedings mischaracterizes what the judge actually stated. Booth has not referred us to any part of the record indicating that the trial judge made such a comment, nor have we been able to find any. Booth does refer us to the motion to recuse and that motion refers to the missing affidavit, *see supra* n. 14. Whatever that affidavit may have stated, the transcript of the motions hearing indicates

clearly that, at the time of ruling, the judge had an open mind on the subjects of the prior motions.

"The first motion which the court wishes to address is the Notice of Adoption of all Previously Filed Motions and the court is assuming that that motion refers to every motion that was filed prior to the granting of the new hearing on the sentencing in this case with reference to the previously held court sentencing.

"None of those motions were ruled on by the Court of Appeals, naturally, in their . . . one-page order reversing the sentence in the prior matter. . . .

"So, Counsel, I am prepared to hear any subsequent argument on any of those motions. The court is thoroughly familiar with all of them, having reviewed all of them, and counsel have, of course, by their motion adopted all previously filed motions and, I believe they used the term de novo consideration. The court has done that."

Defense counsel declined the court's offer to argue further on the prior motions. The prosecutor then pointed out that some of the prior motions had been granted and some denied, which might create some conflict with the rulings about to be issued on the motions then pending. The judge agreed, and decided, "What the court intends to do is to reserve the ruling on those previously filed motions until we have concluded all of the hearings on the motions presently filed, so that if there are any that are crossed, we can then determine whether there are any further discussions, and then make a ruling which would be consistent."

This record does not begin to make a case for recusal.

## XV

Pursuant to our duty under Art. 27, § 414(e), we find that the sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor. This is a case in which not one juror could find a single mitigating circumstance. We further find that the sentence of death is

not excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. The most similar cases are the two prior sentencings of Booth for the murder of Mr. Bronstein. Thus, the instant matter marks the third separate jury to have found a death sentence appropriate for that murder.

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED.

Dissenting opinion by ROBERT M. BELL, J.

ROBERT M. BELL, Judge, dissenting.

Maryland Code (1957, 1982 Repl.Vol.), Art. 27, § 413(k)(2),[1] in effect at the time of the murders for which the petitioner was convicted, provided:

> If the jury, within a reasonable time, is not able to agree as to sentence, the court shall dismiss the jury and impose a sentence of imprisonment for life.

Having deliberated for more than nine hours,[2] the jury informed the trial court that it was "split" and "unable to come to an agreement" on the first issue under § I of the capital sentencing form furnished to it pursuant to Maryland Rule 4–343(e). That issue was:

> Based upon the evidence, we unanimously find that each of the following statements marked "proven" has been proven BEYOND A REASONABLE DOUBT and that each of those statements marked "not proven" has not been proven BEYOND A REASONABLE DOUBT.

---

**1.** Maryland Code (1957, 1992 Repl.Vol.), Art. 27, § 413(k)(2) provides: "If the jury, within a reasonable time, is not able to agree as to whether a sentence of death shall be imposed, the court may not impose a sentence of death."

**2.** The deliberations began at 3:00 p.m. on the first day and ended at 7:15 p.m. The second day's deliberations began at 9:17 a.m., following instructions concerning issues raised by the jury, and, for purposes of this issue, terminated at 2:25 p.m., the time when the statement at issue was delivered to the court.

1. The defendant was a principal in the first degree to the murder.

| Proven | Not Proven |
| --- | --- |

The petitioner's motion that, consistent with former Art. 27, § 413(k)(2), the jury be dismissed and a life sentence entered was denied. Instead, the court, repeating the charge it had earlier given as to § I,[3] advised the jury that it must either unanimously decide that the petitioner was a principal in the first degree, or, by less than unanimous agreement, decide that he was not, which decision must be reached within a reasonable time. The charge included the following modified *Allen*[4] charge:

> In arriving at your decision, you must consult with one another and deliberate with a view to reaching an agreement, if you can do so without violence to your individual judgment.

> Each of you must decide the case for yourself, but you must do so only after an impartial consideration of the evidence with your fellow jurors. During your deliberations, do not hesitate to re-examine your own views. You should change your opinion if convinced you are wrong, but do not surrender your honest belief as to the weight or effect of the evidence only because of opinions of your fellow jurors, or for the mere purpose of reaching a verdict.

---

**3.** The Court instructed:
> The law requires that in order for you to conclude beyond a reasonable doubt that the State has proven that Mr. Booth was a first degree principal in the murder of Mr. Bronstein, all of you must agree within a reasonable time, and your verdict must be unanimous.
> If any of you cannot conclude that the State has proven beyond a reasonable doubt that Mr. Booth is a principal in the murder of Mr. Bronstein, then you must mark "not proven" in the form and enter the words "life imprisonment" in Section 6.

**4.** *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). *See Burnette v. State,* 280 Md. 88, 371 A.2d 663 (1977).

Notwithstanding that the same modified *Allen* charge had been included in the sentencing instructions at the petitioner's request, in so doing, I believe the court erred.

Addressing a related issue—the petitioner's argument that the trial judge has discretion to order the capital sentencing hearing bifurcated so that the principalship issue can be decided separately from the other sentencing issues, including the weighing process contemplated by § V of the sentencing form [5]—the majority asserts:

> The trial judge did not have discretion to bifurcate the sentencing proceeding in order to separate out the principalship issue. Rule 4–343, and the sentencing form it incorporates, are binding. The rule makes clear that principalship and the other sentencing-related issues are resolved in a unitary sentencing proceeding. The rule applies "whenever a sentence of death is sought under ... § 413." Rule 4–343(a). Under Rule 4–343(e) the sentencing form is to be followed, except as provided in section (f). The form plainly contemplates that one jury will complete the form in one proceeding. Policy reasons advanced by Booth for separating the principalship issue from other sentencing issues were considered and rejected in our rule-making capacity when Rule 4–343 was adopted. They were reconsidered when the argument of the dissent in *Colvin* was rejected.[6]

---

5. The capital sentencing form prescribed by present Rule 4–323(e) has 7 sections, each addressing a different issue: § I addresses the principalship issue; § II addresses the defendant's mental capacity; § III addresses the existence of aggravating circumstances; § IV addresses the existence of mitigating circumstances; § V addresses the balance of the aggravating and mitigating circumstances; §§ VI and VII address the sentence.

 The form in use when the murders for which the petitioner was convicted did not contain a section dealing with his mental capacity.

6. *State v. Colvin,* 314 Md. 1, 548 A.2d 506 (1988). The dissent's major premise was that the principalship issue was not properly a part of the sentencing proceeding because, under Art. 27, § 413(c)(1), the definition of "defendant" and "person" "include only a principal in the first degree." 314 Md. at 28, 548 A.2d at 519. Thus, a "person or defendant is not subject to a separate death penalty sentencing proceeding

[Maj. op. at 160–161]. Responding, however, to the petitioner's argument that the giving of the modified *Allen* charge was improper in this case, the majority takes a somewhat different tack. For this purpose, other than the requirement that the same jury, in one proceeding, will answer the questions and complete the form, the majority treats the "unitary proceeding" as a series of separate, though related, issues, which not only may be, but are, and must be, resolved using different considerations, requirements and standards; each threshold issue is a separate issue to be considered, and resolved, by the rendition of a "verdict," utilizing whatever agreement standard is prescribed by the Legislature, prior to moving on to the next issue on the form.

All but one of the threshold determinations making up the "unitary proceeding" require unanimous agreement of the jury. The one that does not, § IV, dealing with mitigating factors, recognizes that lack of unanimity may, itself, be a decision on that issue. The answers to all of the threshold issues may prompt a weighing process, which, even the majority seems to agree, *see* maj. op. at 156 n. 4, is certainly subject to the provision that inability to agree results in life imprisonment.

The majority's position is simple. Section I of the sentencing form

> explicitly requires jury unanimity for a finding that first degree principalship either has or has not been proven beyond a reasonable doubt. There is no middle ground. There is no verdict under § I of the Rule 4–343 form whereby some jurors conclude "proven" and some conclude "not proven."

[Maj. op. at 155]. A verdict on the issue occurs, it says, when principalship in the first degree unanimously has been found either to have been "proven" or "not proven." It is

---

directed by Art. 27, § 413(a) unless he (or she) is determined to be a principal in the first degree. That determination must be made prior to the death penalty sentencing proceeding, otherwise no proceeding is authorized by the statute." *Id.* (Blackwell, J. dissenting).

not enough, and, indeed, is insufficient for the jury to fail to agree one way or the other. Support for this position is gleaned from § IV of the sentencing form, dealing with mitigating factors. Under that section, after a period of deliberations which it determines to be reasonable, the jury may answer that "one or more of us, but fewer than all twelve, find by a preponderance of the evidence that the above circumstance exists." Because there is no comparable provision in § I, the majority maintains that the failure to achieve unanimity by the jury on the § I issue is not, itself, a verdict; rather, it is the court that must decide when a reasonable period of deliberations has occurred and whether, therefore, the jury is deadlocked. It is significant to the majority that the § I issue is one as to which the Legislature contemplated unanimous agreement. As to such issues, it is appropriate for the court to try to break a deadlock and to do so by giving the modified *Allen* charge as was done in this case.[7]

One verdict, and one verdict only, is permitted to be returned in each sentencing procedure. That verdict reflects the jury's ultimate, and unanimous, disposition of the case, *i.e.*, that the defendant be sentenced to death or to life imprisonment, with, or without, the possibility of parole. There are, to be sure, as the sentencing form reveals, threshold issues that the jury must decide. The resolution of those issues, however, are not verdicts; they are findings

---

**7.** In ruling on the petitioner's motion, the trial judge relied on the fact that the petitioner's request for instructions in the sentencing proceedings included the modified *Allen* charge, which he gave. That counsel initially may have requested, and received, the instruction sought does not mean that counsel is bound, for all times, by that request no matter what the circumstances, and, therefore, must in this case acquiesce to its use as a supplemental instruction. An attorney is not required to perpetuate an error he or she may have made earlier in the proceedings, and I believe that the request for such an instruction was error. Nor may the court force him or her to do so. In any event, the petitioner's counsel made it abundantly clear that he objected to any supplemental instructions being given, preferring to have the court determine whether a reasonable period of deliberations had occurred.

in the nature of findings of fact, without which, given our statutory scheme, no verdict could be rendered. As the majority points out, with the exception of § IV, all of the findings require unanimity. Two of the options in § IV require unanimity; however, the third option is totally controlled by the jury itself, requiring it to determine not only the findings to be made, but also when a reasonable period of deliberation has occurred. Notwithstanding the form of § IV, the findings made in respect of that section do not constitute verdicts. Nor, for that matter, does the finding required by § V. Only §§ VI and VII incorporate the jury's verdict.[8]

Jury rendered verdicts of both death and life imprisonment are possible and desirable. The jury's unanimous finding that the defendant is not a principal in the first degree, *see* Maryland Code (1957, 1992 Repl.Vol.), Art. 27, § 413(e)(1); capital sentencing form, § I, Maryland Rule 4–343(e),[9] results in a jury verdict of life imprisonment. Sentencing form, § VI(1). Similarly, should the jury find, unanimously, that no aggravating circumstances were proven or that those that were do not outweigh the mitigating circumstances found, it will have rendered a verdict calling for, again, life imprisonment. On the other hand, when the jury finds unanimously that the defendant was a principal in the first degree and at least one aggravating factor, which outweighs any mitigating circumstances found to exist, the jury will have returned a verdict calling for a death sentence.

---

**8.** The only verdict options are death and life imprisonment. Section VII differentiates between a sentence of life with the possibility of parole and life without parole. Consequently, it is a refinement of the verdict.

**9.** In the present version of the statute, a unanimous jury finding that the defendant was mentally retarded or under age 18 would likewise result in a jury verdict of life imprisonment. *See* Maryland Code (1957, 1992 Repl.Vol.), Art. 27, § 413(g)(4) and (5). *See also*, Maryland Rule 4–343(e), capital sentencing form, section II.

When, notwithstanding the requirement of unanimity, the jury is unable to agree, after a reasonable period of deliberation, on one of the threshold issues, §§ I–IV of the sentencing form, taking them in sequence, of course, or the balance, § V of the sentencing form, the jury will not have returned a verdict. Nevertheless, in that event, former § 413(k)(2) would mandate "a sentence of imprisonment for life," and present § 413(k)(2) would prohibit imposition of a death sentence. It is true that both former and present § 413(k)(2) speak of the jury being unable "to agree as to sentence," rather than the jury's inability to agree as to any issue, including one of the threshold ones; however, when the resolution of an issue is necessary to a decision as to the sentence, inability to agree on it necessarily is an inability "to agree as to sentence." Jury inability to agree unanimously that the defendant was, or was not, a principal in the first degree is no less a failure to agree as to sentence than if the jury, having resolved every other sentencing issue, is unable to achieve agreement on the § V balance. There is no rational basis for reaching a different result depending upon whether the issue is a threshold one or involves the actual balancing of mitigating and aggravating circumstances. That one determination is more directly related to the sentence than another is not a sufficient basis to render the "unitary proceeding," non-unitary.

The majority finds it significant that the issue about which the jury was split was § I(1), as to which unanimity is contemplated. Aside from the fact that, in order to arrive at a jury verdict, each of the sections of the sentencing form, with the exception of § IV, which has the third option, contemplates a unanimous decision by the jury, the failure to arrive at unanimity, even on threshold issues, has implications for the jury's ability to determine the proper sentence. Whether the jury disagreement occurs at the first question or the last, rather than what the legislative aim was when it formulated that particular question, it is the ramifications of the failure to agree on the sentencing process that must be considered. Carrying the majority's

position to its logical conclusion, we must view each threshold issue, each component part of the verdict, if you will, as being separate verdicts, as to which separate, even different, admonitions, or encouragements, might apply. Therefore, an attempt to break a jury deadlock could occur at any stage, with the possible exception of the weighing process, and, perhaps, at multiple stages of the sentencing proceeding. Such a construction of the process renders Art. 27, § 413(k)(2) quite impotent, indeed.

In Maryland, it is inappropriate to instruct the jury with respect to the requirements of § 413(k)(2), whether present or former, in advance of, and in anticipation, of a deadlock. *See Calhoun v. State*, 297 Md. 563, 593–95, 468 A.2d 45, 58–60 (1983), *cert. denied*, 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984). Former § 413(k)(2) has been interpreted as an instruction to the trial court, which, as in traditional trials, must determine when deliberations have continued for a reasonable time and, hence, whether a jury is truly hung. *Id.* This does not, and can not, mean, however, that § 413(k)(2) has no role to play in connection with the various determinations that must be made during the sentencing proceeding. Simply because § 413(k)(2) is addressed to the trial court, and not the jury, and the jury, therefore, is never instructed as to its contents or operation, does not mean that the sentencing proceeding may be treated as if unanimity were a prerequisite of a valid outcome; that up to, and until, the trial court finally determines that the jury is hung, the jury not only need not be told of the effect of a failure to agree but actually may be misled into believing that it *must* agree one way or the other.

The jury's inability to agree unanimously, one way or the other, as to sentence in a capital case tried in this State, former § 413(k)(2) makes clear, necessarily results in imposition of a life sentence. To treat the sentencing procedure, including its component parts, as if unanimity were an absolute prerequisite, notwithstanding former § 413(k)(2), and to so instruct the jury is actively to mislead it. As noted already, while unanimity is required for the *jury to render a verdict*, the law recognizes and thus contemplates

that *the jury* may not render a verdict. Thus, although by its terms, § I of the sentencing form seeks unanimity, in point of fact, unanimity is not absolutely required. That section is only a component part of the verdict; therefore, to the extent that a reasonable time for deliberations has passed, notwithstanding that it is the first and only issue reached, the lack of unanimity must result in the imposition of a life sentence. Giving a modified *Allen* charge, the only purpose of which is to break a deadlock, is a clear statement to the jury that unanimity *must* be achieved. That is clearly not the case.

The rationale for prohibiting the giving of a modified *Allen* charge in a death sentencing proceeding was well stated by the Supreme Court of Delaware in *Rush v. State,* 491 A.2d 439 (Del.Super.1985). The Delaware death penalty statute prohibited imposition of the death penalty unless a unanimous jury found at least one statutory aggravating circumstance and recommended death. When the jury " 'cannot unanimously recommend death, the Court shall sentence the defendant to life imprisonment without benefit of probation or parole.' " 491 A.2d at 453 (quoting 11 Del.C. § 4209(d)(3)). In *Rush,* the jury deliberated for about two hours before informing the bailiff that " 'they cannot reach a unanimous decision and that those who are strongly opposed feel they cannot reach an agreement.' " 491 A.2d at 450. Responding to a question from the court, the foreman explained:

> ... There are—most of the jurors have an open mind, can be convinced one way or the other; there are at least jurors of opposing viewpoints that say they cannot have their viewpoint changed under any circumstances. Therefore, we wish you to instruct us what we should do about the form.
>
> It's signed, with the exception of "yes" or "no" awaiting your instruction.

491 A.2d at 451.

Only the second question, regarding whether there was unanimous agreement to recommend the death penalty, was

not answered. Over the defense's objection, the trial court gave a supplemental instruction, which contained a modified *Allen* charge. Addressing the supplemental instructions, the Supreme Court of Delaware said:

> We are of the opinion that the supplemental instructions which the Trial Judge gave to the jury in the instant case constituted, in effect, an *Allen*-type charge which had no proper place in this § 4209 penalty phase proceeding. The typical *Allen*-type charge is a supplemental instruction given by the trial judge to a deadlocked jury in a case where the law requires a unanimous verdict. Generally, the *Allen*-type charge arises during the guilt phase of a trial. It is designed to prevent a hung jury by urging deadlocked jurors to deliberate further with the hope that ultimately they will return a unanimous verdict of guilt or innocence.... By suggesting further deliberations, a court attempts to prevent unnecessary retrials with the resultant additional expenditures of time and expense by all concerned. (Citations omitted)

491 A.2d at 452. After reviewing its statutory scheme and cases criticizing *Allen*-type charges, the court concluded that in a death sentencing proceeding where "lack of unanimity *per se* results in a sentence of life imprisonment, [the *Allen*-type] instruction is fatal as being overly coercive." 491 A.2d at 453.

Similar sentiments were expressed by the New Jersey Supreme Court in *State v. Hunt*, 115 N.J. 330, 558 A.2d 1259, 1286 (1989). There, the jury sent a note to the trial judge indicating that it could not " 'find a unanimous decision on the mitigating factor[s] outweighing the aggravating factor[s].' " 558 A.2d at 1283. Responding, the trial court gave supplemental instructions which failed to recognize the jury's right to "fulfill its obligations by returning a final non-unanimous verdict." 558 A.2d at 1285. Reversing, the Supreme Court commented:

> In a capital case, unlike the ordinary criminal prosecution, jurors need not reach a unanimous verdict. Thus, a decision not to agree is a legally acceptable outcome,

which results not in a mistrial, but in a final verdict.... For this reason, trial courts should not charge juries in the penalty phase on the importance of reaching a unanimous verdict.... As long as one juror believes that the aggravating factors do not outweigh the mitigating factors, the jury must not impose the death penalty.... As we admonished in [*State v.*] *Ramseur*, [106 N.J. 123, 524 A.2d 188 (1987)], "juries in capital cases [must] be informed of, and free to exercise, their statutory option to return a final, non-unanimous verdict resulting in imprisonment if, after a reasonable period of deliberations, they are unable to agree. 524 A.2d [at 284]. (Some citations omitted.)

558 A.2d at 1286.

In *Ramseur*, the case upon which *Hunt* principally relied, the Supreme Court previously noted the purpose of the *Allen*-type charge and its effect in a criminal sentencing proceeding:

The singular vice of the coercive *Allen*-type charge is its actual purpose and effect to "undo a jury deadlock." ... In the ordinary criminal trial, where a jury deadlock results in a hung jury and hence a mistrial, the remedy for a [*State v.] Czachor* [, 82 N.J. 392, 413 A.2d 593 (1980)] violation is reversal of the defendant's conviction and a new trial. But we believe such a remedy to be wholly inadequate and inappropriate in a capital case. In a capital trial, unlike the ordinary criminal prosecution, the jurors need not reach a unanimous verdict; a true jury deadlock results not in a mistrial but in a final verdict. Thus the evil of the *Allen* charge in a capital murder trial is infinitely worse and significantly more prejudicial than in an ordinary criminal case. In the latter, the defendant is deprived of a deadlock that would have given him a new trial; in the former he is deprived of a deadlock that would have saved his life. (Citations omitted)

524 A.2d at 284–85.[10] *See also Fretwell v. State,* 289 Ark. 91, 708 S.W.2d 630, 633 (1986) (error to give *Allen*-type charge at capital sentencing proceeding); *Rose v. State,* 425 So.2d 521, 524–25 (Fla.1983) (same); *Ex Parte Giles,* 554 So.2d 1089, 1093 (Ala.1987) (same).

Whether, or not, a mistrial should have been declared when the jury failed, within a reasonable time to reach a verdict, is, as we have previously held, *see Calhoun, supra,* a question addressed to the trial court and the exercise of its sound discretion. Although nine hours spent deliberating on a threshold issue, indeed, the very first one presented for the jury's resolution, is rather strong evidence of a

---

**10.** The statute at issue in both *State v. Hunt,* 115 N.J. 330, 558 A.2d 1259 (1989) and *State v. Ramseur,* 106 N.J. 123, 524 A.2d 188 (1987) provided:

> The jury, or if there is no jury, the court shall return a special verdict setting forth in writing the existence or non-existence of each of the aggravating and mitigating factors set forth in paragraphs (4) and (5) of this subsection. If any aggravating factor is found to exist, the verdict shall also state whether it is or is not outweighed by any one or more mitigating factors.
> (a) If the jury or the court finds that any aggravating factor exists and is not outweighed by one or more mitigating factors, the court shall sentence the defendant to death.
> (b) If the jury or the court finds that no aggravating factors exist, or that any aggravating factors which exist are outweighed by one or more mitigating factors, the court shall sentence the defendant pursuant to subsection b.
> (c) If the jury is unable to reach a unanimous verdict, the court shall sentence the defendant pursuant to subsection b.

The Code of Criminal Justice, N.J.S.A. 2C:11–3c(3).

In *Ramseur,* the court found no abuse of discretion when the trial court, after receiving a note stating, "[j]ury unable to reach a unanimous decision. Suggestions please[,]" required the jury to continue deliberations. 524 A.2d at 278. That court, however, did hold that the *Allen* charge was inappropriately given and was, in fact, reversible error because, as it also held, it was "clear that the Legislature contemplated three possible final verdicts in a capital case: a unanimous verdict that results in imprisonment, a unanimous verdict that results in death, a non-unanimous verdict that results in imprisonment." *Id.*

Unlike Maryland, New Jersey permits the jury to be told that it need not reach a unanimous verdict and to hear arguments concerning the effect of non-unanimous recommendation as well as to be instructed

jury deadlock, perhaps reasonable persons may disagree. Perhaps the court did not err by requiring the jury to continue deliberating.

Clear error was committed by the court, however, when, in addition to requiring the jury to continue deliberating, it gave an *Allen*-type charge. In its initial instructions, the trial court instructed the jury, concerning § I, that it must unanimously "agree," within a reasonable time, that the petitioner was a principal in the first degree in order to conclude that his principalship has been proven, but that unanimity was not required to find that it has not been proven. In addition, at the petitioner's request a modified *Allen* charge was given. When the jury indicated its inability to agree as to the petitioner's principalship in the first degree, the court reiterated both its charge on the point and the modified *Allen* charge, this time over the petitioner's very strenuous objections.

Despite former § 413(k)(2), the jury could not be told what the effect of its failure to reach a unanimous agreement as to a sentencing issue was. On the other hand, the repetition of the charge as to § I and the modified *Allen* charge sends the clear and inaccurate, hence misleading, message that unanimity is required to be achieved on that issue at all costs. And sending the message that unanimity is required more than once, particularly, shortly after the jury has indicated that it is "split" and cannot reach a unanimous decision, exacerbates the situation. But, far from requiring unanimity, former § 413(k)(2) provides for the lack of juror unanimity. Nor is the fact that the petitioner requested the modified *Allen* charge and did not initially complain about the § I instruction a waiver of the petitioner's right to object to the court's giving a supplemental instruction.

Addressing the argument by the petitioner that the *Allen*-type charge is coercive, the majority refers to *Lowen-*

---

by the court as to the possible verdicts. *See State v. Hunt,* 558 A.2d at 1285.

*field v. Phelps,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988), pointing out that, in that capital sentencing case, the Supreme Court of the United States found an *Allen*-type charge substantially identical to the one given here to be non-coercive. The majority also takes great pains to point out that several of the cases upon which the petitioner relies were decided prior to the *Lowenfield* decision.

There are significant differences between *Lowenfield* and the case *sub judice.* In *Lowenfield* both the initial instructions and the challenged reinstruction "charged the jury that if it were unable to reach a unanimous recommendation, the court would impose a sentence of life imprisonment without the possibility of probation, parole, or suspension of sentence." 484 U.S. at 234, 108 S.Ct. at 549, 98 L.Ed.2d at 575. Moreover, there, the defendant's counsel did not object to the polling of the jury concerning the extent of its inability to agree nor to the supplemental charge, omissions that the Supreme Court found important as indicative "that the potential for coercion argued now was not apparent to one on the spot." (Footnote omitted). 484 U.S. at 240, 108 S.Ct. at 552, 98 L.Ed.2d at 579.

In contrast, in the case here, consistent with this Court's teachings, *see Calhoun,* the jury was not told what effect its failure to agree on a verdict would have. Moreover, the petitioner's counsel objected strenuously both to the requirement that the jury continue deliberations and the giving of the modified *Allen* charge. Indeed, as we have seen, the supplemental charge emphasized that to reach the conclusion that the petitioner was a principal in the first degree, the issue presented by § I of the sentencing form, the jury had to unanimously agree. By contrast, the same charge told the jury that to conclude that principalship in the first degree had not been proven did not require unanimity.

As to the latter the majority opines that it was error, but not prejudicial. It may have been error, but it also was prejudicial. The finding as to which unanimity was said to be required was a death penalty eligibility finding, *i.e.,*

without the finding, a death sentence could not be imposed. On the other hand, the finding as to which the non-unanimous agreement related would, if made, implicate life imprisonment only. Given the instruction's disparate treatment of these findings, coupled with the giving of the modified *Allen* charge to break the deadlock, it is clear to me that clear prejudice resulted. The intended effect and, indeed, the only plausible result of the modified *Allen* charge, was to foster agreement on the finding that made death a possible outcome. Rather than operating equally to influence the jury's decision one way or the other, the modified *Allen* charge in this case operated to influence the jury to make a unanimous finding that is consistent only with imposition of the death sentence. This demonstrates very graphically why the reinstruction in this case was coercive.

I dissent.